## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| 1925 HOOPER LLC; ROBERT J. ARKO; and ANDREW M. MOORE; on behalf of themselves and all others similarly situated, | Case No.: 1:23-cv-05392-MHC |
| Plaintiffs, | Hon. Mark H. Cohen |
| v. | |
| NATIONAL ASSOCIATION OF REALTORS; *et al.*, | |
| Defendants. | |

## REPLY IN SUPPORT OF
## <u>MOTION TO INTERVENE AND TO TRANSFER CASE</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................1

II.    ARGUMENT..............................................................................................3

    A.    Intervention should be granted...........................................................3

        1.    The motion is timely. .................................................................3

        2.    The parties will not suffer prejudice if the motion is granted. ...8

        3.    Intervenors will suffer prejudice if the motion is not granted. .11

        4.    There are no valid unusual circumstances that militate against intervention. ............................................................................16

    B.    The first to file rule should be applied. ..............................................19

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Altier v. Worley Catastrophe Response, LLC*,
2012 WL 161824 (E.D. La. Jan. 18, 2012) .......................................................8

*Cadle Co. v. Whataburger of Alice, Inc.*,
174 F.3d 599 (5th Cir. 1999) ....................................................................22, 23

*Capitol Recs., Inc. v. Optical Recording Corp.*,
810 F. Supp. 1350 (S.D.N.Y. 1992) ...............................................................21

*Chiles v. Thornburgh*,
865 F.2d 1197 (11th Cir. 1989) ........................................................................6

*Collegiate Licensing Co. v. American Cas. Co. of Reading, Pa.*,
713 F.3d 71 (11th Cir.2013) .....................................................................20, 22

*Gardner v. GC Servs., LP*,
2010 WL 2721271 (S.D. Cal. July 6, 2010) ....................................................20

*Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, FL*,
254 F. App'x 769 (11th Cir. 2007) ...................................................................7

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless Shoesource, Inc.*,
2012 WL 3277222 (N.D. Cal. Aug. 9, 2012) .............................................21, 22

*Purcell v. BankAtlantic Fin. Corp.*,
85 F.3d 1508 (11th Cir. 1996) ..........................................................................8

*Rudolph v. Hudsons Bay Co.*,
2019 WL 1416986 (S.D.N.Y. Mar. 29, 2019) ...................................................8

*Stansell v. Revolutionary Armed Forces of Columbia*,
45 F. 4th 1340 (11th Cir. 2022) .......................................................................6

*United Airlines Inc. v. McDonald*,
432 U.S. 385 (1977) .......................................................................................6, 7

*United States v. Jefferson Cnty.*,
   720 F.2d 1511 (11th Cir. 1983) ...........................................................................6, 7

## Other Authorities

Federal Rule of Civil Procedure 21 ..........................................................................25

## I.    INTRODUCTION

After Intervenors filed this initial motion, Plaintiffs in this action reached settlements with the remaining Defendants. These settlements underscore the appropriateness of granting the motion to intervene and transfer. In particular, Plaintiffs reached an $8.5 million settlement with Weichert, a named Defendant in the first-filed *Gibson* action brought by Intervenors. This settlement came shortly after Weichert proposed a $13 million settlement to counsel for Intervenors—an amount Intervenors rejected as providing inadequate relief to the class.[1] Moreover, Weichert and Plaintiffs in this action began negotiations *the day after* the settlement between eXp and Plaintiffs was publicly announced. And, after an *in camera* review of documents produced by both eXp and Weichert, the *Gibson* court, in an order issued last week, found that there was "plausible evidence of a reverse auction."[2]

---

[1] The facts of Intervenors' negotiations with eXp World Holdings, Inc. and Weichert of North America, Inc. are set forth in the Declaration of Robert A. Braun, which was provided to the Court in the Western District of Missouri on January 15, 2025, and is attached hereto as Exhibit 1. This material includes confidential details related to settlement negotiations and therefore is provided to the Court *in camera*. The monetary offers between Plaintiffs and Weichert were made through direct negotiations, and therefore are unquestionably not subject to any privilege.

[2] Exhibit 2, at 1 (Bough Order).

In the face of such facts, the arguments asserted by the Opposing Parties ring hollow.[3] The Opposing Parties primarily target the timing of the motion to intervene. But Intervenors moved promptly to intervene on October 22, within days after Intervenors first learned of flaws in Plaintiffs' litigation strategy—namely the day when the inadequate settlement between Plaintiffs and eXp was announced on October 7. The flaws in Plaintiffs' litigation strategy have only become more apparent since that date as Plaintiffs have reached a further inadequate settlement with Weichert. The parties will also not suffer prejudice from intervention because these settlements need to be reviewed and approved by a federal court, regardless of whether that happens in this Court or in the Western District of Missouri. There are also no unusual circumstances that warrant denying intervention. Intervenors are properly moving to intervene to represent the interests of the class, which are not served by the litigation strategy of Plaintiffs that involves settling the claims for less than they are worth.

In the meantime, Intervenors have continued to actively litigate the *Gibson* action. The *Gibson* court denied all motions to dismiss brought by Defendants in

---

[3] "Opposing Parties" refers to the separate briefs filed by Plaintiffs 1925 Hooper, LLC, Robert J. Arko, and Andrew M. Moore (collectively, "Plaintiffs"), Defendants eXp World Holdings, Inc. ("eXp"), Weichert of North America, Inc. ("Weichert"), and Higher Tech Realty, LLC ("Higher Tech")/Atlanta Communities Real Estate Brokerage ("Atlanta Communities").

that action, including motions by eXp and Weichert. *See* Exhibit 3 (*Gibson* ECF 590).[4] Discovery has now commenced in full. The *Gibson* court also denied eXp and Weichert's motions to stay the case, and related discovery into the circumstances surrounding their settlements is ongoing. *See* Exhibit 4 (*Gibson* ECF 543) and Exhibit 5 (*Gibson* ECF 543). After reviewing initial discovery *in camera*, the *Gibson* court found there was evidence of a potential reverse auction and ordered further discovery into the circumstances surrounding the settlements. *See* Exhibit 2 (Bough Order). Therefore, there are substantial inefficiencies from allowing these cases to proceed in parallel—the exact kind of problems that the first-to-file rule was designed to prevent. Intervenors respectfully request that the Court grant their motion to intervene and transfer this action to the Western District of Missouri.

## II.    ARGUMENT

**A.    Intervention should be granted.**

### 1.    The motion is timely.

Intervenors moved to intervene within 15 days of the public announcement of Plaintiffs' settlement with eXp. Nevertheless, the Opposing Parties claim that the motion to intervene is not timely. Opposing Parties repeatedly argue that there was a possibility of settlement from the moment this litigation was filed, and that

---

[4] All "Exhibit __" references herein are to the Declaration of Rio S. Pierce filed contemporaneously herewith.

Intervenors should have intervened at that point, notwithstanding that Plaintiffs had taken few if any steps to advance this largely-stayed action.

But Intervenors do not seek to prevent all settlements. Instead, Intervenors seek to represent the interests of the class and only intervene in actions where the class's interests have not been adequately represented. Indeed, there are a number of pending parallel actions throughout the country, but Intervenors have not sought to intervene in any of them, because, to date, no other counsel have engaged in the same deficient litigation strategy that Plaintiffs here have pursued.

Indeed, this Court's decision in *Pinon v. Daimler AG*, 1:18-cv-3984, which the Opposing Parties repeatedly cite, shows why this motion to intervene is timely. *See* Exhibit 8 (*Pinon* Order). In *Pinon*, two parallel class actions, *Pinon* and *Ponzio*, were filed within weeks of each other in August 2018 with substantively identical classes. The *Pinon* case was actively litigated for several years, with the parties engaging in motion practice and discovery. This Court appointed the counsel in the *Pinon* case as interim lead class counsel in April 2020.

In *Pinon*, intervening plaintiffs acknowledged that they first learned of "deficiencies in Plaintiffs' litigation strategy" in approximately June of 2020, before any settlement had been reached, but then waited until December 2020 to intervene, after a settlement had been reached. Critically, this Court in *Pinon* did not measure timeliness from the date that the class actions were first filed in 2018. Instead, this

Court found that "Movants knew or should have known of their interest in the case from at least June 2020, when they allege deficiencies in Plaintiffs' litigation strategy" and that the "Court will assess any delay in timeliness from this date." Exhibit 8, at 9–10 (*Pinon* Order). Thus, the Opposing Parties' various arguments that the Court should measure timeliness from the date when the complaints were first filed, or from when the motion before the JPML was filed, are unfounded.

Here, the Intervenors "first learned of deficiencies in Plaintiffs' litigation strategy" on October 7, 2024, when the settlement with eXp on inadequate terms was publicly announced. Before that date, the Intervenors did not have any indication that Defendants and Plaintiffs in this action intended to engage in a reverse auction that failed to provide sufficient relief to the class. Intervenors then moved promptly—filing this motion to intervene on October 22nd—just 15 days after the date when they first learned of Plaintiffs' inadequate settlement and deficient litigation strategy. Before that point, the Intervenors were not aware of any intention by Plaintiffs in this action to settle on inadequate terms. Indeed, this action had been basically stayed in its entirety until the settlement with eXp was reached. There was no visible litigation strategy from Plaintiffs in this action from which Intervenors could determine whether intervention was necessary.

Intervenors were not in active communications with counsel for Plaintiffs at this point and did not know that Plaintiffs were engaged in settlement negotiations

with eXp, as the publicly available docket only indicated that the parties were preparing to engage in motion practice. *See* ECF 83. Therefore, following the logic of *Pinon*, the motion to intervene is timely because Intervenors filed their motion 15 days after they first learned of deficiencies in the litigation strategy of Plaintiffs in this action.

Other cases cited by the Opposing Parties also support a finding of timeliness. For example, in *Lawton v. Chiles*, the Eleventh Circuit held that a motion to intervene was timely when it was filed three months after the initial motion to dismiss and before any discovery had begun. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). In *Stansell v. Revolutionary Armed Forces of Columbia*, the Eleventh Circuit held that the timeliness inquiry began from when the intervening party should have known that their "interests were not aligned with and thus not protected" by the parties in the litigation. *Stansell v. Revolutionary Armed Forces of Columbia*, 45 F. 4th 1340, 1363 (11th Cir. 2022). Here, Intervenors reasonably believed that counsel for Plaintiffs in this action (which had largely been stayed) were adequately representing the interests of the proposed class until they learned of the settlement with eXp on inadequate terms.

In *United States v. Jefferson*, the Eleventh Circuit explained that, under the Supreme Court's decision in *United Airlines Inc. v. McDonald*, 432 U.S. 385 (1977), a member of a proposed class may assume that Plaintiffs will adequately protect

their interests when they share an identity of interests. *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1516 (11th Cir. 1983) (holding that proposed intervenor's motion to intervene was not timely because intervenor and plaintiffs in the action had a "variance in interest that existed when the litigation commenced" and intervenors only moved to intervene after "two trials" had occurred). As the Eleventh Circuit explained, in *United Airlines*, a member of a proposed class moved to intervene after the named class representative failed to appeal from a denial of class certification. The Supreme Court held that the motion to intervene was appropriate because "as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests." *United Airlines*, 432 U.S. at 394. Here, Intervenors and Plaintiffs shared an identity of interest as members of a proposed nationwide class, and Intervenors moved promptly to intervene after it became clear that their interests would not be protected by the litigation strategy of Plaintiffs in this action.

In other cases relied upon by the Opposing Parties, Intervenors waited far longer to intervene from the date when they first learned a party may not adequately represent their interests. *See, e.g.*, *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, FL*, 254 F. App'x 769, 771 (11th Cir. 2007) (holding motion to intervene untimely because intervenors waited more than three years from the point at which

they first learned a party may not represent their interests, and intervention would undo twenty two months of active litigation); *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1509 (11th Cir. 1996) (intervening party, a defendant in a libel action, sought to intervene after a plaintiff class had obtained a jury verdict that led to a settlement for the plaintiff class that would vacate a judgment that the intervening party argued had preclusive effect in the libel action).

### 2. The parties will not suffer prejudice if the motion is granted.

Prejudice to the parties for a motion to intervene usually focuses on the progress that has occurred to date in the litigation. The Opposing Parties do not and cannot dispute that, apart from settlement, this case has made no progress to date. Unlike in *Gibson*, there has been no discovery and no motion practice. And unlike in *Gibson*, Plaintiffs in this case made no attempts to conduct any pre-motion practice discovery. Opposing Parties' own authority emphasizes that prejudice to the existing parties occurs when they have "effectively and zealously litigated this case during months of discovery and motion practice." *Altier v. Worley Catastrophe Response, LLC*, No. CIV.A. 11-241, 2012 WL 161824, at *9 (E.D. La. Jan. 18, 2012); *see also Rudolph v. Hudsons Bay Co.*, No. 18 CV 8472 (PKC), 2019 WL 1416986, at *3 (S.D.N.Y. Mar. 29, 2019) (motion to intervene came after the filing of two amended pleadings and full briefing on defendants' motion to dismiss). Here, no such effective and zealous representation occurred in this action, in contrast to

*Gibson* where Intervenors have aggressively pursued their claims on behalf of the class.

Instead, the Opposing Parties claim that they will suffer prejudice because intervention will potentially delay approval of the settlements, two of which were entered into *after* the motion to intervene was filed. But the Opposing Parties do not explain why transfer would actually delay settlement because adjudication of the now pending motion for preliminary approval of the settlement will need to happen before a federal court, regardless of whether that occurs in this Court or in the Western District of Missouri.

The Opposing Parties stress that this Court is competent to review and evaluate the fairness of the settlements. That is, of course, correct. This Court is fully competent to review the settlements. But the Opposing Parties do not—and cannot— explain why the Court in the Western District of Missouri is not also competent to review and evaluate the fairness of the proposed settlements if this case is transferred to the first-to-file court. That Court has extensive experience with the litigation from its many years of work supervising the related cases, including managing an entire discovery process and jury trial in the *Burnett* case. Indeed, that Court has expeditiously reviewed numerous settlements to date in the related litigation and conducted multiple final approval hearings. That Court has also already started a discovery process into the terms of the settlements reached with eXp and Weichert.

Thus, that Court is also well positioned to evaluate the fairness and reasonableness of these settlements. Therefore, the Opposing Parties will not be prejudiced from intervention and transfer because their settlements will need to be reviewed and approved by a federal court, regardless of whether the motion to intervene is granted. And that approval process will occur in the same way under the supervision of a competent and experienced judge, regardless of whether it occurs in this Court or in the Western District of Missouri.[5]

Notably, Weichert's claims of prejudice ring particularly hollow because it only reached the settlement with Plaintiffs in this action *after* the motion to intervene was filed. Indeed, as Plaintiffs' own timeline acknowledges, Weichert and Plaintiffs only began negotiations *the day after* Plaintiffs' settlement with eXp was publicly announced. It would be perverse to allow the parties to reach a collusive settlement *after* a motion to intervene is filed to prevent such collusive settlements *and then* claim that the motion to intervene should be denied because they would be prejudiced if approval of their settlement was potentially delayed.

---

[5] The Opposition of Atlanta Communities and Higher Tech frame this issue as a compelling circumstance that warrants against application of the first-to-file rule, but it fails for the same reason.

**3.    Intervenors will suffer prejudice if the motion is not granted.**

Intervenors will suffer multiple forms of prejudice if the motion is not granted, even though there are now pending settlements with all remaining Defendants in this action.

First, Intervenors will suffer prejudice from settlements that fail to provide sufficient relief to the class and are the product of a reverse auction. Recent disclosures about the settlements further underscore that these settlements prejudice the Intervenors. In *Pinon*, this Court indicated several factors to consider in determining whether a reverse auction had occurred and whether Plaintiffs had failed to adequately represent the class. Although discovery has just commenced into the circumstances of the settlements, the information available so far matches a number of the criteria that the Court highlighted in considering whether intervention was warranted.

This Court emphasized in *Pinon* that "there is no indication that Movants have any prospect of reaching a similar or better settlement in their action" as evidence that a reverse auction had not occurred. Exhibit 8, at 19–20 (*Pinon* Order). Here, Intervenors turned down as insufficient Weichert's $13 million settlement offer, mere weeks before Weichert then settled with Plaintiffs in this action for $8.5 million. This is clear evidence that Intervenors had a strong chance of reaching a similar or better settlement in their action.

In *Pinon*, this Court explained that in a reverse auction, defendants "shop around and select the best Plaintiffs." *See* Exhibit 8, at 19 (*Pinon* Order). Here, Plaintiffs specifically marketed to Defendants that they were willing to settle on more favorable terms than the Intervenors. Notably, Judge Bough specifically found, after an *in camera* review, that the *Hooper* Plaintiffs had marketed to both Weichert and eXp that they were prepared to offer a settlement on *more* favorable terms to them than what those Defendants would have paid under the formula set forth in the NAR settlement agreement. In particular, "On August 23, 2024 plaintiffs' counsel in Hooper emailed eXp's counsel a demand that "represent[s] a savings of more than $8 billion, or more than 70%, as compared to what it would cost eXp to opt in to the NAR settlement." Exhibit 2, at 3 (Bough Order). And, "on October 31, 2024, counsel for plaintiffs in Hooper offered to settle for an amount that "represents a savings of more than $40m - $75M as compared to what it would cost Weichert to opt in to the NAR settlement." *Id.* at 3 (Bough Order).

This Court in *Pinon* noted that the plaintiffs and defendants had "engaged in extensive discovery prior to the Settlement Agreement." Exhibit 8, at 17. Here, by contrast, the Plaintiffs have settled with all of the Defendants without any discovery or motion practice at all being conducted.

This Court in *Pinon* also emphasized that the settlement negotiation process in that case "was extended." *Id.* Negotiations did not begin until "eighteen months

after the initiation of the case." *Id.* at 18. Settlement negotiations then took place over an approximate 10-month period from February to November 2020. Here, according to Plaintiffs' own opposition, settlement negotiations commenced (and concluded) prior to any motion and discovery practice.

Interestingly, Plaintiffs' opposition and the declaration of Plaintiffs' counsel discusses the timeline of their settlement negotiations with eXp, Higher Tech, and Atlanta Communities but does not discuss the timeline of their settlement negotiations with Weichert. ECF 126, at 18–20; ECF 126-2, at ¶¶ 12–15. However, that information is included in the declaration they filed with their motion for preliminary approval. ECF 136-1, at 15–16. In that declaration, Plaintiffs disclose that they began negotiations with Weichert on October 8, 2024—*the day after the settlement with eXp was publicly announced and only a week after Intervenors and Weichert met to discuss a settlement*. Plaintiffs do not disclose who initiated those settlement negotiations, but as this Court explained in *Pinon*, "defendants in a reverse auction scenario shop around and select the best plaintiffs." Exhibit 8, at 19. If Weichert immediately contacted Plaintiffs to negotiate a settlement for significantly less money than they were willing to pay the Intervenors immediately after Weichert learned of the eXp settlement, then that would be a textbook example of a reverse auction. Here, Intervenors were unwilling to accept Weichert's offer of $13 million. Weichert then shopped around and found counsel that would accept

$8.5 million to settle the same claims. Plaintiffs have further indicated that they intend to seek $1.7 million in attorney fees from that settlement despite having done no work to litigate claims against Weichert. Indeed, as eXp itself explained in its opposition, a reverse auction occurs when a defendant "negotiates an agreement with the attorneys who are willing to accept the lowest class recovery (typically in exchange for generous attorney fees)." ECF 125, at 33.

Second, there is a very real possibility that the settlements with eXp and Weichert will not be approved, whether by this Court or by the Western District of Missouri. In that circumstance, litigation would need to continue in the actions against those parties. Indeed, one of the key underlying policies of the first-to-file rule is to avoid the inefficiencies to the parties and the court that come from parallel actions being litigated in separate forum.

Notably, Plaintiffs claim that the sole purpose of the motion to intervene is to upend the settlements. However, at the time that Intervenors filed their motion, Plaintiffs had not yet reached a settlement with Weichert, a named Defendant in *Gibson*. As Intervenors explained in their initial motion, there are clear inefficiencies from parallel litigation against the same defendant proceeding in multiple courts, particularly considering the reasonable concern that Intervenors now have about the litigation strategy of Plaintiffs in this action, who have done nothing to litigate this

case and have instead only pursued settlements that fail to provide sufficient relief to the class.

Third, if the settlements are approved, there are still inefficiencies in the notice process from having two notice processes occur in separate courts for identical classes. Plaintiffs state that it is "unclear" how purported inefficiencies would constitute prejudice to Proposed Intervenors. But class members will suffer prejudice in the form of obvious inefficiencies from parallel notice and claims processes for identical classes. Class members will be required to submit multiple notice and claims forms in parallel settlements in order to receive relief from both classes. Furthermore, settlement funds will be expended on a duplicative and inefficient notice campaign rather than being properly used to fund payments to class members. Plaintiffs cite to *Pinon* to claim that there is no prejudice because Intervenor Plaintiffs will be able to object to the settlements. But Plaintiffs omit a critical difference. In *Pinon*, there were parallel actions against a single defendant on behalf of substantively identical putative classes. This meant that only one settlement against one defendant was possible, and there was no possibility of multiple settlements involving multiple defendants, with different notice and claims processes. This inefficient process causes prejudice to the class, particularly if these processes unfold in two different courts.

**4.    There are no valid unusual circumstances that militate against intervention.**

The Opposing Parties argue that there are unusual circumstances that militate against intervention, primarily in the form of a number of *ad hominem* attacks that they make against Intervenor Counsel. These claims are unfounded.

Various Opposing Parties repeatedly argue that Intervenor Counsel are motivated solely by a desire for attorney fees. Such claims are more properly directed toward the actions of counsel for Plaintiffs in this action, who are proposing to collect more than $10 million in fees on a case that they have done nothing to litigate.[6] By contrast, Intervenor Counsel initiated these cases, litigated them for five years through the largest antitrust jury verdict in history, and negotiated landmark reforms to the real estate industry as part of settlement negotiations.

But putting that aside, simple math based on available facts shows that Intervenor Counsel are properly moving to protect the interests of the class, who are not being well served by the settlements. For example, Plaintiffs, after accounting for the requested fees, are proposing to collect $6.2 million from Weichert for the class; Intervenor Counsel rejected as inadequate a settlement from Weichert that would have provided the class, after accounting for fees, with $8.71 million in

---

[6] In their motion for preliminary approval, Plaintiffs stated that they intend to seek attorney fees of up to 20% on the more than $50 million in settlements they have reached.

recovery.[7] In short, Intervenor Counsel are not intervening because they "may miss out on fees for the eXp and Weichert settlements." ECF 125, at 20. Intervenor counsel are intervening, consistent with their duties as putative lead counsel for the class they represent, because these settlements provide inadequate relief to the class and are the product of a collusive reverse auction process.

Opposing Parties also make various unfounded attacks against Plaintiffs' counsel. For example, Plaintiffs' counsel repeatedly claim that Intervenor Counsel somehow attempted to monopolize settlement negotiations through the NAR settlement approval process. Plaintiffs are factually incorrect. Weichert and eXp were excluded by the express terms of NAR settlement framework because they were named defendants in *Gibson*. Exhibit 9, at ¶ 18(h) (NAR Settlement Agreement). Indeed, the factual record shows that Plaintiffs' counsel were actively negotiating settlements with three of the four settling Defendants during the period from May 2024 to August 2024 they claim was monopolized by Intervenors. And indeed, elsewhere, the Opposing Parties repeatedly stress statements from the JPML that contemplated the prospect of settlement negotiations. But the JPML's comments were specifically directed at the NAR settlement approval process that was ongoing

---

[7] This assumes 20% in attorney fees for Plaintiffs in this action, as they requested in their motion for preliminary approval, and 33% in attorney fees for Intervenors in their actions, as they have previously requested for other settlements.

at the time that the JPML denied consolidation. *See* Exhibit 10, at 4 (*JPML* Order). ("Given the broad contours of this new settlement agreement and the changing landscape of the parties' positions on centralization, we think it wise to deny centralization at this time. The settlement may well resolve at least some of the claims in this litigation, if not many."). In short, the JPML specifically backed the process that Plaintiffs now criticize. Moreover, the JPML specifically acknowledged that, after NAR settlement proceedings conclude, "it may be that formal centralization is needed, or perhaps informal coordination efforts." *Id.*

Plaintiffs' counsel also mischaracterize negotiations between Intervenors and Plaintiffs' counsel regarding potential coordination. The parties negotiated regarding proposed terms of coordination that reflected the fact Intervenor Counsel have initiated and successfully litigated this case for a number of years. And indeed, counsel for Plaintiffs here supported consolidation in the Western District of Missouri before the JPML. However, Plaintiffs' counsel ultimately chose to proceed separately, as is their right. Intervenor Counsel object to the inadequate strategy that they have now chosen to pursue, not the fact that they chose to litigate independently.

Similarly, eXp repeatedly claims that Intervenor Counsel "knowingly delayed intervention" so that they could "separately settle with multiple defendants and avoid sharing fees with *Hooper* Plaintiffs' counsel." ECF 125, at 20. As a threshold matter, eXp does not explain why counsel for Intervenors would need to share fees with

counsel for Plaintiffs on any settlement, considering the fact that counsel for Plaintiffs filed a copycat action that had been stayed. Furthermore, Intervenor Counsel have been appointed as interim co-lead class counsel in *Gibson* since April 2024. Exhibit 11 (*Gibson* ECF 180). If Intervenor Counsel simply wanted to maximize their fees, they would have immediately moved to intervene in *Hooper* and transfer it to the jurisdiction where they were lead counsel. They did not do so. Instead, they only moved to intervene once it became clear that the Plaintiffs in this action were engaging in a deficient litigation strategy.

eXp also claims that the motion to intervene should be denied because transfer "defeats *Hooper* Plaintiffs' selected forum." ECF 125, at 22. But application of the first-to-file rule always and necessarily defeats the forum selected by the second-to-file Plaintiffs. This reflects the fact that the forum selected by the first-to-file Plaintiffs should generally be given deference.

Therefore, the motion to intervene is timely and should be granted.

## B.    The first to file rule should be applied.

The Opposing Parties do not dispute that the *Gibson* action was the first-filed action. Instead, the Opposing Parties offer a variety of scattershot arguments against applying the first-to-file rule. Each of the arguments fails.

eXp claims that the first-to-file rule no longer applies because "all *Hooper* defendants have settled with either Intervenors or *Hooper* Plaintiffs" and the

"relevant inquiry is whether there is substantial overlap among the remaining parties that have *not* settled." ECF 125, at 25. As a threshold matter, the settlements have not yet been preliminarily approved by any court. Until the settlements receive final approval, numerous Defendants will remain in both actions.

Furthermore, eXp cites only one case for their asserted proposition, *Gardner v. GC Servs., LP*, No. 10-CV-997-IEG(CAB), 2010 WL 2721271 (S.D. Cal. July 6, 2010). But in that case, the Court found that there was not "substantial similarity of parties" because there was no overlap at all between the proposed class definitions of the two actions. *Id.* at *5. Here, by contrast, the *Gibson* class and the proposed nationwide settlement class are substantively identical. Indeed, eXp in the *Gibson* action has repeatedly argued that the case should be stayed because this settlement releases all of the class's claims against eXp. Therefore, substantial overlap exists.

eXp also argues that Intervenors are improperly "forum shopping" by seeking to transfer the case to the first-to-file jurisdiction. ECF 125, at 27. But the cases they rely on discuss a particular and inapplicable type of forum shopping, namely "the anticipatory suit exception to the first-filed rule" that "applies when one party, on notice of a potential lawsuit, files a declaratory judgment action in its home forum." *Collegiate Licensing Co. v. American Cas. Co. of Reading, Pa.*, 713 F.3d 71, 79 (11th Cir.2013). This is not what occurred here. Intervenors filed a class action, not

a declaratory judgment action. And it is Plaintiffs who chose to file a copycat action on the same legal theory in this jurisdiction.

Plaintiffs, in turn, argue that the *Gibson* action has not progressed farther than the present action because "all that remains in this action is the settlement approval process." ECF 126, at 37. Plaintiffs are wrong. In *Gibson*, Intervenors have actively litigated the case. They have defeated motions to dismiss and have started discovery, including serving extensive discovery on eXp and Weichert and starting negotiations with them regarding that discovery. This is what the authority that Plaintiffs themselves cite understand to be meant by progress. *See Capitol Recs., Inc. v. Optical Recording Corp.*, 810 F. Supp. 1350, 1355 (S.D.N.Y. 1992), *on reargument* (Nov. 20, 1992) (finding that cases were at equal stages because "no discovery or other pretrial proceedings had occurred in either forum at that time"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless Shoesource, Inc.*, No. C-11-1892 EMC, 2012 WL 3277222, at *9 (N.D. Cal. Aug. 9, 2012) (second filed action had progressed further because it had "proceeded to the initial discovery phase" and briefing on dispositive motions was set to commence, while "no substantive motions" had come before the court in the first filed action). Plaintiffs claim that they did not "conduct[] significant formal discovery" or brief early dispositive motions in this case because they were engaging in efforts to settle the case. ECF 126, at 37. As to Weichert, this is clearly incorrect because Plaintiffs themselves

acknowledge settlement discussions did not begin until October. But, in any case, it is possible to both litigate and negotiate settlements at the same time. Indeed, in the experience of Intervenor Counsel, actively litigating the case helps to ensure that class members receive the best settlement. Plaintiffs here, by contrast, focused only on settling the case as quickly as possible.

Various Opposing Parties raise arguments that the Western District of Missouri lacks jurisdiction or is inconvenient for the parties. But in a decision that the Opposing Parties themselves cite, the Eleventh Circuit affirmed a district court's finding that "forum conveniens and forum affinity factors did not warrant suspension of the first-filed rule." *Collegiate Licensing*, 713 F.3d at 79. As the Eleventh Circuit explained, "[w]hile this Court has recognized the convenience of the parties and the second-filed forum's connection with the controversy as relevant in deciding whether an exception to the first-filed rule exists, those factors are non-exclusive and do not mandate transfer of this action" to the second-filed court on the basis of such factors. *See id.* at *79–80. And although eXp attempts to limit the scope of the ruling, ECF 125, at 29, this Court specifically and clearly stated that "while the likelihood of a jurisdictional dispute in the first-filed court may be a factor to consider in applying the rule, resolving the dispute in favor of that court's jurisdiction is *never* a condition precedent to applying it." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605 (5th Cir. 1999) (collecting authority) (emphasis added). As that

decision explained in detail, "because the second-filed court is not binding the litigants before it to a ruling of the first, there is no reason to examine the jurisdiction of the first-filed court. Such a requirement would actually undercut the values of economy, consistency, and comity that the rule is designed to maximize: the jurisdictional ruling of the second-filed court would either conflict with a ruling already made, rehash an issue already decided, or trench on a sister court's treatment of the issue before it has been reached there." *Id.* at 604.

In any case, such factors still favor the first-to-file court. eXp did not contest jurisdiction in the Western District of Missouri. And, since the filing of the original motion, the Western District of Missouri denied Weichert's motion to dismiss on jurisdictional grounds. Exhibit 3 (*Gibson* ECF 590). Therefore, if the settlements with eXp and Weichert are not approved, then the balance of convenience factors favor the Western District of Missouri for ongoing litigation against those entities. The Western District of Missouri possesses jurisdiction over them, there is ongoing related litigation that is proceeding against multiple other Defendants, and there is a clear risk of duplicative and inefficient proceedings if parallel actions proceeded in different jurisdictions.

Higher Tech and Atlanta Communities assert that they would contest personal jurisdiction in the Western District of Missouri if the case was transferred there. At this point in time, there has been no jurisdictional discovery on the extent of contacts

that either has with the Western District of Missouri. But in any case, Intervenors do not anticipate objecting to the settlements that Plaintiffs have reached with Higher Tech and Atlanta Communities.[8] As Intervenors will set forth in their opposition to the motion for preliminary approval, there are concerning features regarding the timeline and details of the negotiation of these settlements that reinforce the fact counsel for Plaintiffs are the attorneys "willing to accept the lowest class recovery" on behalf of the class. ECF 125, at 33. Nevertheless, Higher Tech and Atlanta Communities were not named as Defendants in *Gibson*. And although Intervenors chose not to settle with them on the terms that Plaintiffs here decided to accept, the Intervenors intend to focus the Court's attention on the clearly problematic nature of the other reverse auction settlements that occurred.[9] Higher Tech and Atlanta Communities do not explain why they would contest the jurisdiction of the Western District of Missouri to evaluate a settlement that they claim is fair and reasonable.

---

[8] Similarly, eXp argues that transfer would also prejudice Plaintiffs in this action "by potentially sacrificing their claims against Georgia defendants that are not subject to personal jurisdiction in Missouri." ECF 125, at 22. But those claims now have pending settlements and they will receive the same fair review by either this Court or the Western District of Missouri.

[9] Higher Tech and Atlanta Communities claim that Intervenors "chose to keep quiet" about their settlements. ECF 123, at 28. But at the time that the original motion was filed, Plaintiffs had not settled with Atlanta Communities and there were no publicly available details about the settlement between Plaintiffs and Higher Tech. Intervenors focused their initial motion on the settlement for which they had sufficient information to know that counsel for Plaintiffs were not adequately representing their interests.

Other settling Defendants in *Gibson* have submitted to the jurisdiction of the Western District of Missouri to evaluate the settlements, while reserving their rights to contest personal jurisdiction if the settlements were not approved. Similarly, Higher Tech and Atlanta Communities' various concerns about the location of witnesses are immaterial because they have putatively settled their claims and there is no ongoing litigation at this point anticipated against them in either district. In any case, if this Court deems it appropriate, Intervenors do not object to this Court retaining jurisdiction over the approval of the settlements with Higher Tech and Atlanta Communities while severing and transferring the claims against eXp and Weichert.[10]

Developments since the filing of the original motion with respect to Plaintiffs' settlements with Weichert and eXp only underscore the appropriateness of granting the motion to intervene and transferring this action to the Western District of Missouri. Therefore, Intervenors respectfully request that the Court grant their motion to intervene and transfer case.

---

[10] Federal Rule of Civil Procedure 21 gives the Court the power to sever any claim against a party. *See* FRCP 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.").

Dated:  January 21, 2025                    Respectfully submitted by:

                                            */s/ Rio S. Pierce*
                                            Rio S. Pierce
                                            riop@hbsslaw.com
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            715 Hearst Avenue, Suite 300
                                            Berkeley, CA 94710
                                            Telephone: (510) 725-3000

                                            Steve W. Berman
                                            steve@hbsslaw.com
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1301 Second Avenue, Suite 2000
                                            Seattle, WA 98101
                                            Telephone: (206) 623-7292

                                            Nathan Emmons (Mo. Bar. No. 70046)
                                            nathane@hbsslaw.com
                                            Jeannie Evans
                                            jeannie@hbsslaw.com
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            455 North Cityfront Plaza Drive, Suite 2410
                                            Chicago, IL 60611
                                            Telephone: (708) 628-4949

                                            Michael S. Ketchmark      MO # 41018
                                            Scott A. McCreight        MO # 44002
                                            KETCHMARK & MCCREIGHT
                                            11161 Overbrook Road, Suite 210
                                            Leawood, KS 66211
                                            Tele:  (913) 266-4500
                                            Fax:   (913) 317-5030
                                            mike@ketchmclaw.com
                                            smccreight@ketchmclaw.com

                                            Brandon J.B. Boulware     MO # 54150
                                            Jeremy M. Suhr            MO # 60075
                                            BOULWARE LAW LLC
                                            1600 Genessee, Suite 416

Kansas City, MO 64102
Tele:  (816) 492-2826
Fax:   (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

Michael A. Williams MO # 47538
Eric L. Dirks            MO # 54921
WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele:  (816) 945-7110
Fax:   (816) 945-7118
mwilliams@williamsdirks.com
dirks@williamsdirks.com

Benjamin D. Brown
bbrown@cohenmilstein.com
Robert A. Braun
rbraun@cohenmilstein.com
Sabrina Merold
smerold@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Daniel Silverman
dsilverman@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street, Suite 207
Boston, MA 02130
Telephone: (617) 858-1990

Marc M. Seltzer
mseltzer@susmangodfrey.com
Steven G. Sklaver
ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400

Los Angeles, California 90067
Telephone: (310) 789-3100

Beatrice C. Franklin
bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas 32nd Floor
New York, New York 10019
Telephone: (212) 336-8330

Matthew R. Berry
mberry@susmangodfrey.com
Floyd G. Short
fshort@susmangodfrey.com
Alexander W. Aiken
aaiken@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union St., Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880

***Attorneys for Proposed Intervenors***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record hereby certifies that on January 21, 2025, a true and correct copy of the foregoing was filed electronically by the Court's CM/ECF system, which caused notice and a copy of this filing to be sent to all counsel of record.

Dated: January 21, 2025

*/s/ Rio S. Pierce*
Rio S. Pierce

***Attorney for Proposed Intervenors***