## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| 1925 HOOPER LLC; ROBERT J. ARKO; and ANDREW M. MOORE; on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No. 1:23-cv-05392-MHC |
| v. | Hon. Mark H. Cohen |
| THE NATIONAL ASSOCIATION OF REALTORS; *et al.*, | |
| Defendants. | |

## DEFENDANT eXp WORLD HOLDINGS, INC.'S CORRECTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR JOINDER IN PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL

Henry R. Chalmers (GA Bar No. 118715)
T. Chase Ogletree (GA Bar No. 579860)
ARNALL GOLDEN GREGORY LLP
171 17th Street, NW, Suite 2100
Atlanta, GA 30363
Phone: (404) 873-8646
*henry.chalmers@agg.com*
*chase.ogletree@agg.com*

James A. Morsch (*Pro Hac Vice*)
Francis X. Riley (*Pro Hac Vice*)
SAUL EWING LLP
161 N. Clark Street, Suite 4200
Chicago, IL 60601
Phone: (312) 876-7866
*jim.morsch@saul.com*
*francis.riley@saul.com*

Stephen J. Siegel (*Pro Hac Vice*)
Andrew D. Campbell (*Pro Hac Vice*)
Elizabeth C. Wolicki (*Pro Hac Vice*)
ARMSTRONG TEASDALE LLP
100 North Riverside Plaza
Chicago, IL 60606
Phone: (312) 419-6900
*ssiegel@atllp.com*
*acampbell@atllp.com*
*ewolicki@atllp.com*
#117840394

*Counsel for Defendant eXp World Holdings, Inc.*

**<u>TABLE OF CONTENTS</u>**

*<u>Page</u>*

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ..................................................................................1

ARGUMENT ...........................................................................................2

I.    eXp's Settlement is Fair, Reasonable And Adequate.......................2

    A.    The Relief Provided To The Class Is Appropriate...............4

    B.    The *Bennett* Factors Favor Approval ...................................8

        1.    The Benefits Of Settlement Outweigh The Risks At Trial........8

            a.    The "Rule Of Reason" Applies Here...............9

            b.    Establishing eXp's Liability
                Would Be Very Difficult ................................10

                (1)    Membership In An
                     Organization Is Not A Conspiracy.......................11

                (2)    There Is No Other
                     Evidence That eXp Colluded ..............................12

                (3)    Plaintiffs' Theory Of Liability Ignores
                     The Evidence And Misreads The Rule ...............12

        2.    The Second And Third *Bennett* Factors Favor Approval .........13

            a.    At A Trial, eXp Would Show That After The August
                2024 NAR Rules Changes, Commission
                Rates Have Not Declined, Refuting Damages ..............13

            b.    eXp's Settlement Is Within The Range Of Recovery ....15

II.    eXp Negotiated With Hooper Plaintiffs At Arm's Length...........................16

A.    *Gibson* Settlement Discussions ............................................................16

B.    *Hooper* Settlement Discussions .........................................................20

C.    None of the Indicia Of A "Reverse Auction"
      Are Found In eXp's Settlement Negotiations .....................................23

# TABLE OF AUTHORITIES

***Cases***                                                    ***Page(s)***

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988) ................................................................... 13, 16

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ........................................................................ 3, 16

*Borup v. CJS Sols. Grp., LLC*,
   No. CV 18-1647 (PAM/DTS), 2019 WL 2137369 (D. Minn. May 16, 2019)....27

*Burrows v. Purchasing Power, LLC*,
   No. 1:12-cv-22800, 2013 WL 10167232 (S.D. Fla. Oct. 7, 2013)................. 9, 16

*Camp v. City of Pelham*,
   No. 2:10-CV-01270-MHH, 2014 WL 1764919 (N.D. Ala. May 1, 2014) ..........9

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
   No. 1:04-CV-3066-JEC, 2012 WL 12906499 (N.D. Ga. Oct. 26, 2012)....... 3, 16

*George v. Acad. Mortg. Corp. (UT)*,
   369 F. Supp. 3d 1356 (N.D. Ga. 2019)..................................................................4

*Greco v. Ginn Dev. Co., LLC*,
   635 F. App'x 628 (11th Cir. 2015) .....................................................................23

*Huyer v. Njema*,
   847 F.3d 934 (8th Cir. 2017) ...............................................................................7

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021) ...........................................................................3

*In re Gen. Motors Corp. Engine Interchange Litig.*,
   594 F.2d 1106 (7th Cir. 1979) .............................................................................7

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .....................................................................4, 5

*In re Packaged Ice Antitrust Litig.*,
   322 F.R.D. 276 (E.D. Mich. 2017) ......................................................................5

*In re Sunbeam Sec. Litig.*,
   176 F. Supp. 2d 1323 (S.D. Fla. 2001) ................................................................13

*In re Wendy's Co. S'holder Derivative Action*,
   No. 1:16-cv-1153, 2020 WL 13169460 (S.D. Ohio Jan. 24, 2020) ...................24

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..................................................................................11

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) .............................................................................9

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .............................................................................11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................................................9

*Lipuma v. Am. Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................... 3, 24, 27, 28

*Matsushita Elec. Indus. Co. v. Epstein*,
   516 U.S. 367 (1996)..............................................................................................26

*Ponzio v. Pinon*,
   87 F.4th 487 (11th Cir. 2023) ........................................................ 4, 23, 24, 25

*Realcomp II, Ltd. v. F.T.C.*,
   635 F.3d 815 (6th Cir. 2011) ...............................................................................10

*Reifert v. S. Cent. Wis. MLS Corp.*,
   450 F.3d 312 (7th Cir. 2006) ...............................................................................10

*Robertson v. Sea Pines Real Est. Cos., Inc.*,
   679 F.3d 278 (4th Cir. 2012) ...............................................................................10

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
   314 F. 3d 1180 (10th Cir. 2002) ..........................................................................28

*Salmonson v. Bed Bath & Beyond, Inc.*,
   No. CV 11-2293 SVW (SSX),
   2012 WL 12919187 (C.D. Cal. Apr. 27, 2012) ...................................................29

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ................................................................11

*Swinton v. SquareTrade, Inc.*,
  960 F.3d 1001 (8th Cir. 2020) ....................................................... 24, 25

*Texaco, Inc. v. Dagher*,
  571 U.S. 1 (2006)................................................................................10

*Thomas v. Blue Cross & Blue Shield Ass'n*,
  333 F. App'x 414 (11th Cir. 2009) ....................................................26

*Thompson v. Metro. Multi-List, Inc.*,
  934 F.2d 1566 (11th Cir. 1991) .........................................................10

*Tuttle v. Audiophile Music Direct Inc.*,
  No. C22-1081JLR, 2023 WL 3318699 (W.D. Wash. May 9, 2023)...................24

*United States v. Realty Multi-List, Inc.*,
  69 F.2d 1351 (5th Cir. 1980) .............................................................10

## ***Rules***

Fed. R. Civ. P. 23 .............................................................. *passim*

Defendant eXp World Holdings, Inc. ("eXp") respectfully submits this Corrected Memorandum In Support Of Its Motion For Joinder In Plaintiffs' Motion For Final Settlement Approval (the "MFA"). Below, eXp addresses its settlement and demonstrates that it is "within the range of possible recoveries" and is fair, reasonable and adequate.

## INTRODUCTION

eXp reached a settlement of $34 million with *Hooper* Plaintiffs – the second largest settlement reached by a brokerage defendant in any of the commission lawsuits that followed the *Burnett* verdict. This sum compares favorably with judicially approved settlements reached in other such commission lawsuits, including *Gibson.* Under eXp's settlement, the class will receive tens of millions of dollars without the risk of prolonged litigation, proportionately higher attorney's fees, and accumulated expenses. And eXp's settlement contains the same non-economic terms as other settlements that have been finally approved.

Moreover, were this case to continue to trial, Plaintiffs would face a substantial risk of recovering nothing. First, the Rule of Reason would apply, not the *per se* analysis, which diminishes *Hooper* Plaintiffs' likelihood of success at trial. Second, Plaintiffs' conspiracy claim is premised on eXp being a member of NAR and adhering to what Plaintiffs term NAR's Mandatory Offer of Compensation Rule (the "Rule"), that purportedly compelled home sellers to set and pay the non-

negotiable commission of buyer brokers. But membership in a trade association is not an agreement to conspire, and eXp's commissions have always been negotiable. There is no evidence that eXp colluded.

Further, the damage theory on which *Burnett* plaintiffs prevailed at trial two years ago – mimicked by Plaintiffs here – is less plausible with each passing day. In August 2024, under its commission-case settlement, NAR stopped requiring or even permitting sellers to make blanket offers of compensation to cooperating (buyer) brokers when listing their homes on MLSs. Nonetheless, sellers have continued to pay buyer broker commissions and buyer and seller commission rates have generally remained constant. eXp would vigorously contest that the class suffered damages.

*Gibson* Plaintiffs have argued since November 2024 that the eXp settlement was inadequate or the result of a reverse auction. Those arguments were wrong and unfounded then and they have not improved with time. As shown below and in eXp's forthcoming response to objections, the Court should reject them.

For the reasons herein and in the MFA, eXp requests that the Court enter final approval of eXp's settlement with *Hooper* Plaintiffs.

## **ARGUMENT**

### I.    **eXp's Settlement is Fair, Reasonable And Adequate**

Rule 23 requires the Court to consider whether "the relief provided for the class is adequate, taking into account ... the effectiveness of any proposed method of

distributing relief to the class, including the method of processing class member claims" and the "terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C). Courts in the Eleventh Circuit also consider the *Bennett* factors in determining whether a settlement should be approved. *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021) (applying *Bennett* factors even after the 2018 amendments to Rule 23).

In considering whether a settlement is fair, reasonable, and adequate, courts evaluate the proposed settlement "in its totality." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). In that regard, the Court should consider that the range of outcomes extends from no liability to total victory and must consider the settlement in light of the attendant risks. *See*, *e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-CV-3066-JEC, 2012 WL 12906499, at *3 (N.D. Ga. Oct. 26, 2012). Indeed, litigation risk is itself a *Bennett* factor. 737 F.2d 982 at 986. The Court also must consider the "complexity, expense and duration of litigation." *Id.* Rule 23(e)(2) instructs courts to consider, among other things, whether the proposed settlement "was negotiated at arm's length," the relief provided for the class "is adequate, taking into account ... the costs, risks and delay of trial and appeal; ... [and] the terms of any proposed award of attorney's fees[.]" Fed. R. Civ. P. 23(e)(2)(B)(C)(i, iii).

Contrary to *Gibson* Plaintiffs' assertions, the Court need "not ... determine whether the settlement reached by the parties is the best possible deal." *E.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019); *see Ponzio v. Pinon*, 87 F.4th 487, 505 (11th Cir. 2023) (even if court rejected settling plaintiffs' claim valuation and credited that of objectors, "it would still find that the relief afforded under the settlement agreement was adequate").

A.    <u>The Relief Provided To The Class Is Appropriate</u>

**Injunctive Terms:**    The non-economic terms of eXp's settlement with *Hooper* Plaintiffs are on par with the settlements reached in *Gibson*. The settlements reached with Compass, Real Brokerage, Realty ONE, @properties and Douglas Elliman in *Gibson* – all of which have been finally approved – mandated substantial practice changes. *Gibson*, Dkt. 161 (*see* ¶ 49 of Compass, Real Brokerage, Realty ONE, @properties, & Douglas Elliman settlements).    Substantively identical practice changes are found in eXp's settlement. (Dkt. 136-3 ¶ 49; MFA at 7-8.)

**Economic Terms:**    eXp's settlement is also on par economically with settlements reached and approved in *Gibson,* even though eXp has unique defenses to liability and damages as discussed in Section I.B.1 & 2.a., below. Relative to the volume of eXp's sales – a common metric in assessing antitrust damages[1] – eXp's

---

[1]    *See*, *e.g.*,  *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 472 (S.D.N.Y. 1998) (granting motion for final approval of antitrust settlement plan where settlement amount for each of five defendants was based on their respective

settlement amount falls squarely within the range of settlements reached in similar litigation with other brokerages. T360, an industry publication, provides the annual sales volume for the 1000 largest real estate brokerages in the United States.[2]  This publication was relied upon in both *Gibson* and *Burnett*. *See* NAR Corrected Settlement Agreement, *Burnett*, Dkt. 1458-1, ¶ 25; *id.*, Appendix C (allowing non-defendant brokerages to "opt-in" to settlement agreement by paying percentage of their 2022 T360 Sales Volume). Relative sales volume reflects relative market share, which is a commonly-used benchmark for antitrust settlements. *See, e.g.*, *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. at 472 (granting motion for preliminary approval of antitrust settlement based on market share).

Relative to its annual sales, eXp's settlement is right in the middle of the settlements *Gibson* Plaintiffs reached, all of which have received final approval.

| Brokerage | 2022 Total Sales, Per T360 | Settlement Amount | Settlement Amount As a Percentage of Brokerage's 2022 Total Sales |
|---|---|---|---|
| Engel & Völkers | 7,825,000,000 | 6,900,000 | 0.088% |
| Real Brokerage | 12,135,000,000 | 9,250,000 | 0.076% |

---

market share); *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 294 (E.D. Mich. 2017) (finding settlement amount representing percentage of settling defendant's sales was "fair and reasonable").

[2]    Top Brokerages in 2023, 2023 Real Estate Almanac, T360 (June 2023), https://www.t3trends.com/intel/top-brokerages-in-2023/.

| Brokerage | 2022 Total Sales, Per T360 | Settlement Amount | Settlement Amount As a Percentage of Brokerage's 2022 Total Sales |
|---|---|---|---|
| Baird & Warner | 6,271,000,000 | 2,200,000 | 0.035% |
| Keyes | 7,550,000,000 | 2,400,000 | 0.032% |
| @properties | 24,512,000,000 | 6,500,000 | 0.027% |
| Compass | 227,977,000,000 | 57,500,000 | 0.025% |
| Real Estate One | 6,137,000,000 | 1,500,000 | 0.024% |
| Redfin | 39,761,000,000 | 9,250,000 | 0.023% |
| **eXp** | **159,136,000,000**[*] | **34,000,000** | **0.021%** |
| Realty ONE | 26,625,000,000 | 5,000,000 | 0.019% |
| K Company Realty d/b/a LoKation | 4,944,000,000 | 925,000 | 0.019% |
| Fathom Realty** | 16,019,000,000 | 2,950,000 | 0.018% |
| Douglas Elliman | 42,828,000,000 | 7,750,000 | 0.018% |
| United Real Estate | 23,185,000,000 | 3,750,000 | 0.016% |
| HomeSmart | 33,543,000,000 | 4,700,000 | 0.014% |
| John L. Scott Real Estate Affiliates, Inc. | 12,126,000,000 | 1,000,000 | 0.008% |
| [*] eXp's 2022 total sales volume per T360 (a third-party publication) is ███████ than eXp's actual total domestic residential sales volume for 2022 of $████. (*See* Exhibit A, Declaration of James Bramble ("Bramble Dec."), at Ex. 10.) | | | |
| ** Fathom Realty negotiated a mediated settlement with *Gibson* Plaintiffs under an opt-in process established under the court-approved NAR settlement. | | | |

At $34 million, eXp's settlement is the second largest settlement reached outside *Burnett*, one of only two eight-figure non-*Burnett* settlements, and is

undoubtedly within the range of possible settlements that could be approved as fair, reasonable, and adequate. *See In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1125 n.24 (7th Cir. 1979) ("'fairness' may be found anywhere within a broad range of lower and upper limits.").[3]

A detailed comparison to the settlement *Gibson* Plaintiffs reached with Compass – the brokerage closest in size to eXp – confirms the fairness, reasonableness and adequacy of eXp's settlement. Between 2020 and 2023, eXp's average total U.S. sales volume was about $ █████████ (Bramble Dec. at Ex. 10), while Compass' average total sales volume was approximately $ ████████. (Dkt. 136-1, Declaration of Bryan M. Knight ("Knight Dec.") ¶ 22.) Compass settled for $57.5 million. Compass's settlement amount to sales volume ratio imputes a settlement amount for eXp of $ ████████. This is virtually identical to eXp's settlement with *Hooper* Plaintiffs. (*See also* MFA at 16.)

Moreover, the class will receive a greater percentage of the settlement value for eXp's settlement than settlements approved in *Gibson*. *Gibson* class counsel have obtained fee awards of 33.33% on their settlements. (*See Gibson*, Dkt. 530 at 57.) By contrast, *Hooper* Plaintiffs seek a 20% fee award. (Dkt. 136 at 13, 24; *see*

---

[3]    eXp's financial condition is a "neutral" factor in approval. *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) ("the second factor, the defendant's financial condition, was neutral because [defendant's] financial condition was stable").

MFA at 9-10.)   Thus, the class will benefit substantially more from the eXp settlement than a comparable settlement reached in *Gibson*.  Indeed, adjusted for net recovery to the class, the eXp settlement lands firmly in the top half of comparable settlements approved in *Gibson*, and ranks ahead of eXp's closest comparator, Compass. (*See* Appendix A.) And the *Gibson* settlements are the relevant comparisons here, not those reached in *Burnett* -- the *Burnett* settlements were reached *after* years of discovery, successful class certification, and denial of *Burnett* defendants' dispositive motions.  Indeed, two *Burnett* settlements were reached just weeks before trial, and the other two after the jury found NAR and the two remaining brokerages liable in the amount of nearly $1.8 billion (before trebling).   eXp's settlement is fair, reasonable and adequate.

### B.    The *Bennett* Factors Favor Approval

In addition to satisfying the Rule 23(e)(2) factors, eXp's settlement also satisfies the *Bennett* factors. To avoid duplication, eXp joins in *Hooper* Plaintiffs' discussion of Rule 23 and the *Bennett* factors (*see* MFA at 13-23), and limits this discussion to *Bennett* factors specific to eXp and its settlement.

### 1.    The Benefits Of Settlement Outweigh The Risks At Trial

There is substantial risk that Plaintiffs will not recover against eXp.  The Amended Complaint (cited as "AC ¶ _") contains over 200 paragraphs of allegations, but only a few relate to eXp.  eXp was not involved in creating or active

in promoting the Rule (adopted long before eXp was formed in 2009) or leading NAR. The sum of the allegations against eXp are that it is an NAR member, abides by its rules, and sits on NAR's 900+-member Board and an unrelated committee. The first *Bennett* factor favors approval where there is "no guarantee that the plaintiffs would prevail at trial on their [] claims." *Camp v. City of Pelham*, No. 2:10-CV-01270-MHH, 2014 WL 1764919, at *3 (N.D. Ala. May 1, 2014); *see also Burrows v. Purchasing Power, LLC*, No. 1:12-cv-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013) (granting approval where "success at trial is not certain for Plaintiff[s].").

There is no such guarantee here. Plaintiffs face high hurdles to establish that eXp is liable, and their damage claim is dubious.

### a.    The "Rule Of Reason" Applies Here

"[P]er se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010). The *per se* rule "is appropriate only after courts have had considerable experience with the type of restraint at issue[.]" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). The Rule is not such a practice; accordingly, the Rule of Reason analysis would apply, significantly reducing *Hooper* Plaintiffs' chances of recovery.

The only decision eXp has identified in which a conspiracy based on MLS or NAR rules was subject to a *per se* analysis is *Burnett*. By contrast, the Eleventh Circuit, as well as other U.S. Circuit Courts of Appeal have applied the Rule of Reason to MLS rules because of the "pro-competitive effects inherent in multilist services." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1579-80 (11th Cir. 1991); *accord Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 290 (4th Cir. 2012); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 826-27 (6th Cir. 2011); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006); *United States v. Realty Multi-List, Inc.*, 69 F.2d 1351, 1365 (5th Cir. 1980). Because Plaintiffs' claim would be analyzed under the Rule of Reason, liability would be difficult to establish. *Texaco, Inc. v. Dagher*, 571 U.S. 1, 5 (2006) (the rule of reason requires a plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive" whereas the *per se* rule is reserved for when "no elaborate study of the industry is needed to establish [a contract's] illegality").

      **b.**   <u>**Establishing eXp's Liability Would Be Very Difficult**</u>

In "essence," the Amended Complaint alleges a conspiracy that: "(a) obliges sellers to bear excessive costs for services rendered by buyer brokers to the seller's opponent; (b) artificially inflates buyer brokers' compensation; and (c) promotes and abets 'steering' and similar practices that thwart innovation and stifle competition." (AC ¶ 12.) Again, the core of the allegations against eXp are that it is a NAR

member, agrees to abide by NAR's rules, and sits on NAR's 900+-member Board. However, membership in an organization is not a conspiracy and Plaintiff's claim hinges on misstating the Rule. As a result, proving eXp liable for the alleged conspiracy is highly unlikely.

### (1) Membership In An Organization Is Not A Conspiracy

Membership in an association and adherence to its rules is not a conspiracy. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Absent evidence of *actual* collusion, Plaintiffs' ability to prove eXp participated in a conspiracy based on its membership in the nation's largest trade association – with over 1.5 million members – would be a formidable, if not insurmountable, challenge.

Moreover, NAR established the Rule in 1996. (AC ¶ 82.) eXp was not founded until 2009 (Bramble Dec., Ex. 4 at exp_GSC_000120) and, therefore, was not active in promoting the Rule, or leading NAR when it adopted the Rule. In the absence of any evidence that eXp had a role in developing the Rule, establishing liability based on membership within NAR is, at best, tenuous.

### (2)    There Is No Other Evidence That eXp Colluded

After taking years of discovery from NAR and leading brokerages in *Burnett* and *Moehrl*, neither *Gibson* Plaintiffs' pleading (*Gibson*, Dkt. 232) nor the Amended Complaint here allege any evidence of actual collusion by eXp.

### (3)    Plaintiffs' Theory Of Liability Ignores The Evidence And Misreads The Rule

Allegedly, the Rule established an anticompetitive market where "sellers" are "coerced into subsidizing the buyer's costs" including "standardized" and "non-negotiable" commissions for buyer's agents. (AC ¶¶ 4, 6, 81.)  Were Plaintiffs to proceed to trial, this theory would face significant obstacles against eXp.

As an initial matter, eXp requires that all of its commissions be negotiable. (Bramble Dec., Ex. 4 at exp_GSC_000120.)  Thus, eXp's practice differed from Plaintiffs' interpretation of the Rule.

Moreover, Plaintiffs' theory depends upon a misstatement of the NAR Handbook.  The Amended Complaint contends that the NAR Handbook dictates that commissions under the Rule are "non-negotiable."  Yet, the words "non-negotiable" do not appear anywhere in the Rule.  (*See* Exhibit B, NAR Handbook at 34-35.) Rather, the Handbook provided that in "filing property with the [MLS], participants make blanket unilateral offers of compensation" and shall specify "the compensation being offered."  This does not bar negotiation.  Indeed, the NAR Handbook admonishes that "*the compensation paid by a listing broker to a cooperating broker*

*... is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker*." (*Id.* at 20; emphasis in original). Further, as of 2019 – the first year of Plaintiffs' alleged class – all associations operating an MLS had to certify they had provided notice to their members concerning "the negotiability of brokerage commissions, subagency compensation and compensation to buyer's agents." *Id.* At a trial, eXp would have strong evidence that under the Rule, buyer broker compensation was negotiable.

### 2.    The Second And Third *Bennett* Factors Favor Approval

The second and third *Bennett* factors are often analyzed together. *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988), *aff'd sub nom. Behrens v. Wometco Enters.*, 899 F.2d 21 (11th Cir. 1990). To calculate the range of recovery, the Court must first determine the appropriate standard of damages and then determine where in this range a fair, adequate and reasonable settlement amount is found. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1331 (S.D. Fla. 2001).

### a.    At A Trial, eXp Would Show That After The August 2024 NAR Rules Changes, Commission Rates Have Not Declined, Refuting Damages

If eXp's settlement is not approved, eXp would vigorously contest damages. eXp would show that the value of Plaintiffs' claims is minimal, if not zero.

It has now been more than a year since the Rule was withdrawn, and practically speaking, not much has changed. As a result, Plaintiffs will not be able to prove damages and the *Burnett* verdict cannot be replicated.

First, eXp would show that key assumptions underlaying the *Burnett* verdict are untrue. The *Burnett* Plaintiffs' expert testified that the damages were $1.785 billion, based on "*all* the buy side commissions paid by home sellers[.]" (Exhibit C, *Burnett* Tr. Trans. at 564:25-565:1.) The *Burnett* expert gave a couple rationales for his opinion. The first was that if not for the Rule buyers' agents would not be used by buyers, who would forego having an agent and generally represent themselves:

> Q: What would happen – in the but-for world, what would happen if there wasn't price fixing? Would that ever happen? Would the – like – in your opinion, would those buyer commissions have ever been paid?
>
> A: No, they would not have. That's one of the things we observed in these benchmark countries, that buyers' agents get used very, very rarely. When they do, buyers pay for them. *If this rule had never existed*, I think buy side agents would – you wouldn't see that many of them. Buyers would deal with that on their own. So in this but-for world, that buyer agent just wouldn't exist.

(*Id.* at 566:11-22; emphasis added.) But this has not happened. eXp would show that since the Rule changed to not require or permit a listing on an MLS to include an offer of buyer broker compensation, buyers generally have not paid for their own broker or gone it alone without a buyer broker at all. Sellers have continued to offer compensation to buyers' brokers, refuting the *Burnett* expert's second rationale – that sellers would not pay buyer broker commissions unless they were forced to:

Q:  Can you tell the jury in your economic opinion what would – what would be happening *absent that rule*?

A:  Sellers would not be paying buyer brokers' fees.  They would not be making those offers upfront. It doesn't make economic sense that a seller would be paying for an agent that is representing somebody directly adverse to their interest.

(*Id.* at 567:16-21; emphasis added.)  This also has not happened.  eXp would demonstrate that sellers have continued to offer compensation to buyer brokers.[4]

Further, eXp would show that since August 2024 commission rates paid to both sellers' brokers and buyers' broker have not meaningfully changed. Notwithstanding that offers of compensation to buyer brokers are not required or permitted on MLSs, and disclosure obligations reinforce to sellers that they are free to negotiate their listing brokers' commission and they need not offer any compensation to buyers' brokers, eXp would demonstrate that sellers continue to pay about the same percentage to each.

Thus, plaintiffs are unlikely to be able to demonstrate that the Rule caused damage to home sellers.  For this reason as well, eXp's settlement is the class's best chance for a meaningful recovery from eXp.

**b.    eXp's Settlement Is Within The Range Of Recovery**

The range of outcomes extends from no liability to total victory and must be

---

[4]      *See*, *e.g.*, Group Exhibit D, "Where real estate commissions stand a year after new rules introduced," CNBC.com, August 26, 2025; "Real estate commissions are holding steady, but for how long?" HousingWire, April 30, 2025.

considered in light of the attendant risks. *See*, *e.g.*, *Columbus Drywall & Insulation*, 2012 WL 12906499, at \*3. Thus, even a minimal settlement can be approved. *See, e.g., Bennett*, 737 F.2d at 986; *Burrows*, 2013 WL 10167232, at \*6; *Behrens*, 118 F.R.D. at 542 ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."). As just shown, eXp's $34 million settlement easily clears that bar.

The *Bennett* factors confirm that eXp's settlement is fair, reasonable and adequate.

## II.    eXp Negotiated With Hooper Plaintiffs At Arm's Length

Rule 23 requires that the proposed settlement be negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(B); (*see* MFA at 17). *Gibson* Plaintiffs have argued previously, and again in their objection (Dkt. 191), that the eXp settlement with *Hooper* Plaintiffs was the result of a reverse auction. This argument should be rejected. While eXp will rebut *Gibson* Plaintiffs' objection in its forthcoming response thereto, the below demonstrates that eXp's negotiations with *Hooper* Plaintiffs were indeed at arms-length.

### A.    *Gibson* Settlement Discussions

Less than ███████ after filing *Gibson*, *Gibson* Plaintiffs reached out to eXp to propose a settlement. Their demand was $████████. *At the time that offer was made, it was* ████████████████████████████. eXp did not then

counteroffer or meaningfully engage in a settlement dialogue.  (Bramble Dec. ¶ 3.)

███████████ later, *Gibson* Plaintiffs reached out again to ask whether eXp

was interested in settlement discussions.  (*Id.* ¶ 5.)  ██████████ later, eXp and *Gibson*

Plaintiffs participated in a telephone call.  eXp conveyed that it was open to trying

to resolve the case but was in a very different place than *Gibson* Plaintiffs.  ████

███████████████  Despite eXp countering at ██████████ of *Gibson*

Plaintiffs' $████████████, *Gibson* Plaintiffs' counsel said █████████████

████████████████████████████████████ and

would recommend mediating with Greg Lindstrom ("Lindstrom"), a mediator whom

*Gibson* Plaintiffs said was involved with other related but unidentified mediations.

(Exhibit E, Declaration of Stephen J. Siegel ("Siegel Dec."), ¶ 4.)[5]

eXp agreed to *Gibson* Plaintiffs' proposal to mediate with Lindstrom on April

3, 2024 in Los Angeles.  (*Id.* ¶ 5.)  On March 31, *Gibson* Plaintiffs provided eXp

with their Compass settlement agreement and noted that ███████████████

████████████████████████ (Bramble Dec. ¶ 7.)

eXp and *Gibson* Plaintiffs mediated with Lindstrom on April 3.  ████████

---

[5]    Attached to the Bramble Dec. and Siegel Dec. are certain documents
provided to the *Gibson* court and to *Gibson* Plaintiffs pursuant to the January 17,
2025 settlement discovery order in *Gibson* (Dkt. 637). eXp has not attached or cited
each document provided to the *Gibson* court and *Gibson* Plaintiffs, but should this
Court wish to have a full set of these materials *in camera*, eXp will provide them.



(*Id.* ¶¶ 9, 11.)

(Bramble Dec. ¶¶ 12-14; Siegel Dec. ¶ 6.)  eXp never again communicated directly with *Gibson* Plaintiffs about settlement.  (Siegel Dec. ¶ 7.)

18



████████████████████, eXp had a final debrief call with Lindstrom on June 24. At the end of the call, eXp told Lindstrom that it did not plan to call him again.  (*Id.* ¶ 15.)  eXp had no further communications with Lindstrom.  (*Id.*)

**B.    _Hooper_ Settlement Discussions**

On ████████, eXp reached out to *Hooper* Plaintiffs and, on ████, had an initial conversation with them through eXp's national and Georgia counsel of record. (Bramble Dec. ¶ 16; Siegel Dec. ¶ 10.)  The next day, ████, *Hooper* Plaintiffs ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. *Hooper* Plaintiffs offered to maintain confidentiality

under a non-disclosure agreement.  (Bramble Dec. ¶ 16.)

A  non-disclosure  agreement  was  signed ███████████████████████

███████████████████████████████████████. (*Id.* ¶ 17.) ███████████

███████████████████████████████████████████ (*Id.* ¶ 18.)  By

then, communications with the *Gibson* mediator or *Gibson* Plaintiffs were long over.

On ████████████████████████████████████████████████

████████████████████████████████.   On  ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. (*Id.* ¶¶ 20-22.)

On  September  10,  eXp  proposed  the  parties  use  retired  Judge  Daniel

Weinstein as mediator. ████████████████████:



█████████████████████████████████████████████████████████████

██████████████████ (Siegel Dec. ¶¶ 17-18; *see also* MFA at 5.)



█████████████████████████████████████████████ (Bramble Dec. ¶¶

21

23-24; Siegel Dec. ¶ 19.)  At no time before or during the *Hooper* mediation did eXp

discuss its prior settlement negotiations with the *Gibson* Plaintiffs with either

*Hooper* Plaintiffs or the mediators.  (Siegel Dec. ¶¶ 21-22; Bramble Dec. ¶¶ 33-34.)

eXp and *Hooper* Plaintiffs mediated with Judge Weinstein and Ambassador

Carden on ████████. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(Bramble Dec. ¶¶ 25-26.) ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (*Id.* ¶ 26.)

    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



█████ (*Id.* ¶ 28.)[6] ████████████████████████████

████████████████████████████████████████████████

███████████████████████████ (*Id.* ¶ 29.)

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████ (*Id.* ¶¶ 29-30.)

Thereafter, the parties worked to finalize a long-form settlement agreement, which was fully executed on December 9.  (*Id.* ¶ 35.)

### C.    None of the Indicia Of A "Reverse Auction" Are Found In eXp's Settlement Negotiations

A "reverse auction" may be considered in the settlement approval process and is found where a proposed settlement is marred by collusion and the absence of arms' length negotiation.  *Ponzio*, 87 F.4th at 504.  The essential element of a reverse auction is "fraud, collusion, or the like[.]"  *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 632 (11th Cir. 2015) ("absent fraud, collusion, or the like, the district

---

6    ████████████████████████████████████████████
████████████████████████████████████████

court 'should be hesitant to substitute its own judgment for that of counsel.'"); *see also Tuttle v. Audiophile Music Direct Inc.*, No. C22-1081JLR, 2023 WL 3318699, at *4 (W.D. Wash. May 9, 2023) (reverse auction requires "'concrete evidence' of collusion."); *Lipuma*, 406 F. Supp. 2d at 1316 (finding no reverse auction where procedural irregularities did not show collusion). A reverse auction is a rarely-found practice in which "ineffectual class lawyers" sell out their clients by colluding with defendants in exchange for "generous" attorneys' fees. *See*, *e.g.*, *Swinton v. SquareTrade, Inc.*, 960 F.3d 1001, 1005 (8th Cir. 2020).

In determining the plausibility of "reverse auction" allegations, courts look for the presence of certain factors. It is not enough to "simply say the words 'reverse auction' and expect to invalidate a proposed settlement…. Otherwise, the 'reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions.'" *See In re Wendy's Co. S'holder Derivative Action*, No. 1:16-cv-1153, 2020 WL 13169460, at *8 (S.D. Ohio Jan. 24, 2020), *aff'd,* 44 F.4th 527 (6th Cir. 2022) (internal citations omitted).

As discussed below, no indicia of a "reverse auction" are present.

**Use of a Mediator.** eXp and *Hooper* Plaintiffs mediated with esteemed JAMS mediators, retired Judge Weinstein and Ambassador Carden. ███████████ ██████████████████████████████████████████████ This factor weighs strongly against finding a reverse auction. *Ponzio*, 87 F. 4th at 507.

**Arm's Length Negotiations.** eXp and *Hooper* Plaintiffs' negotiations were at arms' length, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, and then continued and resolved with the assistance of two mediators. Under a *Gibson* court order, eXp produced hundreds of pages of documents regarding negotiations with *Hooper* Plaintiffs and, after providing his attached Declaration, Mr. Bramble sat for a Rule 30(b)(6) corporate deposition into these negotiations, including regarding the Siegel Dec. The extensive discovery shows the settlement was reached at arms' length and that eXp did not "pit" the *Gibson* Plaintiffs versus *Hooper* Plaintiffs, or vice versa, in a bidding process to drive down the settlement amount. A reverse auction requires collusion and the absence of arm's length negotiations. *See Ponzio*, 87 F.4th at 507 (no reverse auction had occurred where the settlement agreement "was not the product of fraud or collusion but negotiated at an arm's length formal mediation.").

**No Agreement on Attorneys' Fees.** eXp made no agreement with *Hooper* Plaintiffs regarding the amount of their attorneys' fees. In such circumstances, courts routinely find no reverse auction. *See* Order Denying Motion to Intervene, *Pinon v. Daimler AG, et al.*, No. 1:18-cv-03984-MHC (March 29, 2021), Dkt. 89 (Cohen, J.) ("*Pinon* Order"); *Ponzio*, 87 F. 4th at 508; *Swinton*, 960 F.3d at 1006.

**No Cherry-Picking Plaintiffs' Counsel.** In a "reverse auction," defendants may "shop around and select the best plaintiffs." (*Pinon* Order at 19.) eXp did not

"shop around."  eXp was sued by both sets of Plaintiffs' lawyers. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ (Siegel Dec. ¶¶ 4, 6, 11.)

After *Gibson* Plaintiffs and eXp reached an impasse, eXp did not "shop around" for the weakest plaintiff.  eXp is a named defendant in seven putative class actions that bring seller-side commission antitrust claims.  Two of the seven (*Gibson* and *Hooper*) seek to form nationwide classes, while the other five seek to form multi-county or state-wide classes[7] (collectively, "Regional Plaintiffs").  Under the identical factual predicate doctrine, eXp could have sought to reach a nationwide settlement with Regional Plaintiffs.  *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 417 (11th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376–77 (1996)) ("In order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action.").  Theoretically, eXp could have

---

[7]    *Fierro v. NAR, et al*, No. 24-cv-00449 (C.D. Cal.); *Latham v. NAR, et al*., No. 24-cv-244 (E.D. Cal.); *Grace v. NAR, et al*., No. 23-cv-6352 (N.D. Cal.); *Whaley v. NAR, et al*., No. 24-cv-00105 (D. Nev.); *Burton v. Bluefield Realty Group, LLC, et al*., No. 24-cv-1800 (D.S.C.).

afforded such Regional Plaintiffs the opportunity for a much larger, nationwide settlement than they could have hoped to obtain from their county- and state-level litigation claims. eXp did not do so, but instead negotiated with the only other plaintiffs (*Hooper*) who had brought a nationwide class claim against eXp. eXp had every right to settle and move on from these cases.

**No Attempt to "Cabin Off" Parallel Actions.** eXp did not oppose consolidation of the various parallel actions before the JPML. (*See* Response of eXp to Plaintiffs' Motion for Transfer and Centralization, *In re Real Estate Commission Antitrust Litig.*, MDL No. 3100 (J.P.M.L.), Dkt. 300.) Because eXp made no effort to keep these parallel actions separate or hide the existence of one of the cases, this factor weighs against finding a reverse auction. *See Borup v. CJS Sols. Grp., LLC*, No. CV 18-1647 (PAM/DTS), 2019 WL 2137369, at *1 (D. Minn. May 16, 2019).

**No Cross-Pollination of Settlement Discussions.** eXp did not cross-pollinate its settlement discussions. eXp did not discuss its *Gibson* negotiations with *Hooper* Plaintiffs and did not discuss its *Hooper* negotiations with *Gibson* Plaintiffs. This is entirely proper and weighs against finding a reverse auction. *Pinon* Order, 18 (confidentiality of settlement negotiations indicates a lack of collusion). eXp was under confidentiality obligations with respect to both settlement discussions. And keeping the discussions separate is proof there was no reverse auction or collusion. *See*, *e.g.*, *Lipuma*, 406 F. Supp. 2d at 1307, 1316 (where details of negotiations that

27

broke down were not shared, there was no bidding and no reverse auction).

**The "Timing" of eXp's Settlement.** After ████████████████████

████████████████████████████████████████████

██████, eXp had no direct settlement communications with *Gibson* Plaintiffs. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Siegel Dec. ¶¶ 6, 8-9, 11, 14.)

Settlement negotiations with *Hooper* Plaintiffs did not begin in earnest until

████████████████████████████████. There is nothing

improper with failing to achieve a mutually agreeable settlement with one set of

plaintiffs and then subsequently and independently achieving a mutually agreeable

settlement with different plaintiffs in a parallel action. *See Pinon* Order; *Rutter &

Wilbanks Corp. v. Shell Oil Co.,* 314 F. 3d 1180, 1189 (10th Cir. 2002) ("Objectors

reverse auction argument 'would lead to the conclusion that no settlement could ever

occur in the circumstances of parallel or multiple class actions – none of the

competing cases could settle without being accused by another of participating in a

'collusive reverse auction.'"); *see also Lipuma*, 406 F. Supp. 2d at 1316. That is

what happened here; there was no reverse auction.

But *even had* there been simultaneous settlement negotiations (and there were

not) that would not indicate a reverse auction without, among other things, collusion or impropriety (of which there is none here). *See Salmonson v. Bed Bath & Beyond, Inc.*, No. CV 11-2293 SVW (SSX), 2012 WL 12919187, at *4-5 (C.D. Cal. Apr. 27, 2012) ("engaging in settlement discussions with plaintiffs in parallel actions does not constitute a collusive reverse auction" where defendant "was perfectly willing to negotiate simultaneously with all of plaintiffs whom it believed had standing.").

The Court's role under Rule 23(e) is to decide whether the settlement is fair, reasonable and adequate, not to second-guess whether the class might have achieved a different settlement with other lawyers in the future. eXp's settlement readily meets the standards of Rule 23(e) and should be granted final approval.

Dated: October 29, 2025                 Respectfully submitted,

                                        eXp WORLD HOLDINGS, INC.

                                        By: */s/ T. Chase Ogletree*
                                            One of Its Attorneys

## **CERTIFICATE OF COMPLIANCE**

This is to certify that the foregoing was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1(C).

This 29th day of October, 2025.

ARNALL GOLDEN GREGORY LLP

*/s/ T. Chase Ogletree*
T. Chase Ogletree

**APPENDIX A**

| Brokerage | 2022 Total Sales, Per T360 | Settlement Amount | Fees Sought | Net Recovery To Class | Net Recovery To Class As a Percentage of Brokerage's 2022 Total Sales |
|---|---|---|---|---|---|
| Engel & Völkers | $7.8B | $6.9M | 33.3% | $4.6M | 0.059% |
| Real Brokerage | $12.1B | $9.25M | 33.3% | $6.2M | 0.051% |
| Baird & Warner | $6.3B | $2.2M | 33.3% | $1.5M | 0.023% |
| Keyes | $7.6B | $2.4M | 33.3% | $1.6M | 0.021% |
| @properties | $24.5B | $6.5M | 33.3% | $4.3M | 0.018% |
| **eXp Realty** | **$159.1B** | **$34M** | **20.0%** | **$27.2M** | **0.017%** |
| Compass | $228B | $57.5M | 33.3% | $38.3M | 0.017% |
| Real Estate One | $6.14B | $1.5M | 33.3% | $1M | 0.016% |
| Redfin | $39.8B | $9.25M | 33.3% | $6.2M | 0.016% |
| Realty ONE | $26.6B | $5M | 33.3% | $3.3M | 0.013% |
| K Company Realty d/b/a LoKation | $4.94B | $0.925M | 33.3% | $0.617M | 0.012% |
| Fathom Realty | $16.0B | $2.95M | 33.3% | $2M | 0.012% |
| Douglas Elliman | $ 42.8B | $7.75M | 33.3% | $5.2M | 0.012% |
| United Real Estate | $23.2B | $3.75M | 33.3% | $2.5M | 0.011% |
| HomeSmart | $33.5B | $4.7M | 33.3% | $3.1M | 0.009% |
| John L. Scott Real Estate Affiliates, Inc. | $12.1B | $1M | 33.3% | $0.667M | 0.005% |