# EXHIBIT C

```
 1                IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF MISSOURI
 2                       WESTERN DIVISION

 3   SCOTT AND RHONDA BURNETT,              )
     RYAN HENDRICKSON, JEROD BREIT,         )
 4   SCOTT TRUPIANO, and JEREMY KEEL,       )
     on behalf of themselves and all        )
 5   others similarly situated,             )
                       Plaintiffs,          )Case No.
 6            vs.                           )19-CV-00332-SRB
                                            )
 7   THE NATIONAL ASSOCIATION OF            )Kansas City, Missouri
     REALTORS, et al.,                      )October 19, 2023
 8                     Defendants.          )

 9             ............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 3 OF 11
10         BEFORE THE HONORABLE STEPHEN R. BOUGH
             UNITED STATES DISTRICT COURT JUDGE
11

12     Proceedings recorded by electronic stenography
               Transcript produced by computer
13

14                       APPEARANCES

15   For the Plaintiffs:      MR. MICHAEL S. KETCHMARK
                              MR. BENJAMIN H. FADLER
16                            MR. SCOTT A. McCREIGHT
                              Ketchmark & McCreight PC
17                            Two Hallbrook Place
                              11161 Overbrook Road, Suite 210
18                            Leawood, Kansas 66211

19                            MR. BRANDON J.B. BOULWARE
                              Boulware Law LLC
20                            1600 Genessee Street, Suite 416
                              Kansas City, Missouri 64102
21

22

23

24

25
                              360
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1                MR. KETCHMARK:  Counsel, we would move No. 4592A
2    into evidence.
3                MR. GLASS:  No objection from NAR.
4                THE COURT:  Admitted.
5                MR. KETCHMARK:  And also -- and Exhibit No. 2527A is
6    the same one, Mr. Glass.  We'd move 2527A in as well.
7                MR. GLASS:  No objection from NAR.
8                THE COURT:  Admitted.
9     Q    (BY MR. KETCHMARK)  Let's walk through this.  Let's
10   start with the total number at the bottom.  First across the
11   top it says table 9A, summary of total damages.  Do you see
12   that?
13    A    Yes, I do.
14    Q    Subject:  MLS classes.  Is that the four MLS classes
15   that we've been -- that -- MLSs that we've been talking about?
16    A    Yes.
17    Q    Across the bottom of that, there's a total number that's
18   there.  Do you see that?
19    A    Yes, I do.
20    Q    Can you read for the record -- I know the jury can see
21   that, but can you read for the record what that dollar amount
22   is?
23    A    $1,785,310,872.
24    Q    And is that -- what does that number represent?
25    A    That is all the buy side commissions paid by home

1  sellers that listed with one of the agent's brokers affiliated
2  with these four companies.
3  Q    And did you go through for each of these defendants year
4  by year for the HomeServices-related defendants, year by year
5  in this report, show the actual transactions as reflected in
6  this report year by year, and the actual buy side commissions?
7  A    Yes, I did.
8  Q    And so you did that for Keller Williams, for
9  HomeServices, for Realogy, and for Anywhere?
10 A    Yes, that's correct.
11 Q    What was the purpose behind reaching that calculation of
12 damages?  Why did you do that?
13 A    That's the measure of antitrust damages in a
14 price-fixing case.
15 Q    Now, as part of your report, did you look at the concept
16 or the idea of this -- of whether or not there should be any
17 value given -- or an offset for the services that were
18 received on the buy side of that?  When someone sells a house
19 and they turn around and they're a buyer later, do you
20 understand what I'm talking about there?
21 A    Yes, I do.
22 Q    As part of your report and your analysis in this case,
23 did you look at that issue?
24 A    I considered it, yes.
25 Q    Can you tell the jury about that?

565

1   A   It just doesn't make economic sense that in a rigged
2   system where sellers have over a billion dollars taken out of
3   their pocket because of this mandatory rule, you somehow get
4   to offset that because those same sellers entered into another
5   transaction that was also rigged where a different seller got
6   ripped off for their buy side commission.
7          So it -- you just don't get to do that in
8   price-fixing cases.  It doesn't make sense.
9   Q   Why doesn't it make sense from an economic standpoint?
10  A   Because --
11  Q   What would happen -- in the but-for world, what would
12  happen if there wasn't price fixing?  Would that ever happen?
13  Would the -- like -- in your opinion, would those buyer
14  commissions have ever been paid?
15  A   No, they would not have.  That's one of the things we
16  observed in these benchmark countries, that buyers' agents get
17  used very, very rarely.  When they do, buyers pay for them.
18         If this rule had never existed, I think buy side
19  agents would -- you wouldn't see that many of them.  Buyers
20  would deal with that on their own.
21         So in this but-for world, that buyer agent just
22  wouldn't exist.
23  Q   If you would turn with me in your report to page 147.  I
24  mean, it's a very long report, correct?
25  A   Yes.

566

```
 1   Q    How many pages is -- was your report?
 2   A    Main report was 150 --
 3   Q    One page is where your signature is at?
 4   A    Yes.
 5   Q    Did you do a supplemental report as well?
 6   A    Yes, I did.
 7   Q    How many pages was your supplemental report, Exhibit
 8   No. -- the 2552, to refresh your memory.
 9             Signature page be on page 48?
10   A    That was 48 pages.
11   Q    If you would turn with me to page 147 of your main
12   report.
13             Under your damage analysis, did you reach any
14   conclusions where -- about what would happen absent this rule?
15   A    Yes, I did.
16   Q    Can you tell the jury in your economic opinion what
17   would -- what would be happening absent that rule?
18   A    Sellers would not be paying buyer brokers' fees.  They
19   would not be making those offers upfront.  It doesn't make
20   economic sense that a seller would be paying for an agent that
21   is representing somebody directly adverse to their interest.
22   Q    Now, does that mean that buyers' agents are bad or
23   you're against buyers' agents?
24   A    No.  It's just -- you know, when you're in that kind of
25   adversarial relationship, why should one party pay for the
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter