# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

1925 HOOPER LLC; ROBERT J. ARKO; and ANDREW M. MOORE; on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS; *et al*.,

Defendants.

CASE NO.: 1:23-cv-05392-MHC

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH DEFENDANTS HIGHER TECH REALTY, LLC D/B/A MARK SPAIN REAL ESTATE, EXP WORLD HOLDINGS, INC., WEICHERT OF NORTH AMERICA, INC., AND ATLANTA COMMUNITIES REAL ESTATE BROKERAGE, LLC**

Before the Court is Plaintiffs' Motion for Final Approval of Settlements with Defendants Higher Tech Realty, LLC d/b/a Mark Spain Real Estate, eXp World Holdings, Inc., Weichert of North America, Inc., and Atlanta Communities Real Estate Brokerage, LLC (the "Settling Defendants"). (DE 199). Preliminary approval was granted on May 23, 2025. (DE 183). Notice to the Settlement Class commenced on July 22, 2025, and Class members were provided with an opportunity to opt out of, or object to, the Settlements. Four (4) Class members filed objections. (DE 192, 195). Plaintiffs filed a Motion for Final Approval on September 26, 2025. (DE 199).

Defendants Weichert of North America, Inc. and eXp World Holdings, Inc. filed motions joining Plaintiffs' Motion for Final Approval on September 26, 2025. (DE 200 & 203, respectively.) The Court held a hearing on October 28, 2025, at which arguments were presented for and against final approval. Having considered the arguments at the hearing and reviewed the written submissions, and based on all materials in the record, the Motion for Final Approval is hereby GRANTED, for the reasons set forth below.[1]

## I. <u>The Notice Process Satisfies the Requirements for Final Approval</u>

1. At preliminary approval, the Court designated CPT Group, Inc. ("CPT") as the settlement administrator (the "Settlement Administrator"). As directed by the Court, CPT implemented the class Notice Plan, as defined and set forth in Plaintiffs' Motion for Preliminary Approval. (*See generally*, D.E. 136.) In connection with their final approval motion, Plaintiffs submitted a declaration from Carole Thompson (an employee of CPT)—which she subsequently supplemented on October 20, 2025—summarizing the notice that was given to class members, and the resulting claims to date, opt-outs, and objections. (D.E. 199-2, 221). Notice was provided by first-class U.S. mail, text messages, electronic mail, social media, website, and digital and print publications. Without repeating all the details from

[1] Unless otherwise defined herein, all defined terms in this Final Approval Order and any accompanying Judgment shall have the respective meanings set forth in the Settlement Agreements. (*See* D.E. 136-2, 136-3, 136-4, and 136-5.)

Ms. Thompson's declaration, the Court finds that the direct notice program was successful. Nearly 365,000 direct notices were mailed or emailed to those members of the class for whom Plaintiffs had obtained direct contact information from the Settling Defendants. CPT's website, social media, and other digital notice efforts generated more than 31 million total impressions, prompting over 113,000 clicks to view the settlement website, and its press release was distributed to 900 associated press outlets with a total potential audience of over 74 million individuals. In addition to the formal class notice process, and beyond the paid press release, CPT made targeted postings on TopClassActions.com and ClassAction.org, which generated additional traffic to the settlement website. The settlement website that CPT established has had over 69,000 unique visitors and over 250,000 page views.

2. The claims period expired on September 20, 2025. As of October 20, 2025, CPT received a total of 752,764 claims.

3. In contrast to the broad scale of the notice program and the large volume of claims, there were only two objections (encompassing four total objectors) and 12 requests for exclusion from the class.

4. Based on the record, the Court finds that the notice given to the Settlement Class fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.

5. The notice fully and accurately informed members of the Settlement Class of all material elements of the Settlements. The Class members received notice of: (a) the pendency of the Action; (b) the terms of the proposed Settlements, including the Released Claims, Released Parties, and Releasing Parties; (c) their rights under the proposed Settlements, including how to receive the benefits offered by the Settlements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlements; (e) their right to object to any aspect of the proposed Settlements; (f) their right to appear at the Final Approval Hearing; (g) Co-Lead Counsel's (referred to herein as "Class Counsel") request for attorneys' fees and expenses; and (h) the binding effect of this Final Judgment and Order Approving Settlement on all Persons who did not timely exclude themselves from the Settlement Class.

## II. Final Certification of the Settlement Class

6. For purposes of the settlement of the claims against the Settling Defendants, and only for that purpose, the Court finally certifies the following class, except for those who have timely opted out: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and July 22, 2025 (the date of notice to the class members). The defined Class specifically excludes the Defendants, along with their

officers, directors, and employees. Entities in which any Defendant holds a controlling interest, as well as any affiliates, legal representatives, heirs, or assigns of the Defendants, are also not included. This exclusion extends to any judicial officer overseeing this case, along with their immediate family members and judicial staff, and the counsel representing the Plaintiffs, including the employees of their respective law firms.

7. The Court also finds that the appropriate state and federal officials were timely notified of the Settlement Agreements under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, and that ninety (90) days have passed without comment or objection from any governmental entity.

8. The Court finds that certification of the Settlement Class is warranted in light of the Settlements under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Class; (3) Plaintiffs' claims are typical of the claims of the Class members; and (4) Plaintiffs and Co-Lead Counsel have demonstrated that they have fairly and adequately represented the interests of the Class members and will continue to do so.

9. The Court finds the Settlement Class satisfies the "predominance" requirement of Federal Rule of Civil Procedure 23(b)(3) because common issues,

including whether Settling Defendants entered into a conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context.

10. The Court finds the Settlement Class satisfies the "superiority" requirement of Federal Rule of Civil Procedure 23(b)(3) in light of, *inter alia*: (a) the interests of the Class members in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning these claims already commenced; (c) the desirability of concentrating the litigation of the claims in a particular forum and (d) the impracticality or inefficiency of prosecuting or defending separate actions..

11. The Court reaffirms the appointment of Plaintiffs 1925 Hooper, LLC, Robert J. Arko, and Andrew M. Moore as the Settlement Class Representatives. The Court finds that the Settlement Class Representatives have fairly and adequately protected the interests of the Settlement Class, and will continue to do so, as: (a) the interests of the Settlement Class Representatives are consistent with those of Class members; (b) there appear to be no conflicts between or among the Settlement Class Representatives and the other Class members; (c) the Settlement Class Representatives have been active participants in both the prosecution and the settlement of this litigation, and will continue to do so; and (d) the Settlement Class Representatives and Class members are represented by qualified, reputable counsel

who are experienced in litigating large, complex consumer class action cases.

12. As discussed below in response to objections filed by parties in competing cases, the Court has specifically considered that the Settlement Class is nationwide and releases claims arising from sales of homes listed on NAR and non-NAR MLSs, including all claims on behalf of those Class members who both bought and sold homes during the class period. This is because the home buyer claims arise from the identical factual predicate as the home seller claims. Plaintiffs here plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges certain NAR rules.

13. The Court finds that certifying a nationwide class is warranted, as: (a) a nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class; (b) a nationwide settlement will conserve judicial and private resources; and (c) Class members were fully apprised of the Settlement Class definition through the notice process. As the Court explains more thoroughly below, the Settlements could not have been consummated absent providing for a nationwide recovery and release.

## III. <u>The Settlements Are Fair, Reasonable and Adequate</u>

14. The law generally encourages settlement. *See Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("[O]ur judgment is informed by the strong judicial policy favoring settlement as well as by the realization the compromise is

the essence of settlement."); *In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021) ("there is a 'strong judicial policy favoring settlement"). Furthermore, "settlements of class actions are highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits." *Carnegie v. Mut. Sav. Life Ins. Co.*, Civ-99-S-3292-NE, 2004 WL 3715446, at *17 (N.D. Ala. Nov. 23, 2004) (citations omitted); *see also* 4 *Newberg and Rubenstein on Class Actions* § 13:44 (6th ed.) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding lengthy trials and appeals."). However, the Court does not rely on any presumption in favor of settlements here because the Court finds these Settlements are fair, reasonable, and adequate.

15. "[D]etermining the fairness of the settlement is left to the sound discretion of the trial court." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1087 (11th Cir. 2023); *Ponzio v. Pinon*, 87 F.4th 487, 504 (11th Cir. 2023) (same).

16. Rule 23(e)(2) identifies criteria for determining whether to grant final approval of a proposed class action settlement. Specifically, the Rule requires consideration of whether: (a) the class representatives and proposed class counsel have adequately represented the class; (b) the settlement was negotiated at arm's

length; (c) the relief provided to the class is adequate when considering (i) the cost, risk, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed award of attorneys' fees, including timing of payment, and (iv) any agreement required to be identified under Rule 23(e)(3); and (d) the settlement treats Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

17. The Court has analyzed the Settlements under the factors set forth in Rule 23(e)(2), as well as case law interpreting the Eleventh Circuit's *Bennett* factors, which are substantially similar to the considerations in Rule 23(e)(2). *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) ("many [*Bennett*] considerations overlap those found in Rule 23(e)(2)"). As a result of the Court's analysis, the Court finds that the Settlements are fair, reasonable and adequate.

18. First, Settlement Class Representatives and Class Counsel have adequately represented the Class and will continue to do so. Class Counsel and the Class Representatives prosecuted this action on behalf of the Class with vigor and dedication, conducting themselves in the Settlement Class's best interest and adequately representing the proposed Settlement Class. Specifically, Class Counsel:

(a) engaged in extensive pre-filing investigation beginning in the Fall of 2023; (b) drafted and filed a detailed complaint and an amended complaint against twenty-seven (27) defendants, the majority of which do business only in Georgia; (c) worked alongside counsel for the Missouri *Gibson* Plaintiffs to attempt to consolidate numerous class actions asserting similar claims (including this action); (d) engaged in extensive settlement negotiations with the Settling Defendants, which included undertaking thorough and detailed research into the Settling Defendants' relevant financial information, reviewing publicly available market data regarding each defendant, and comparing each defendant with similarly situated brokerages; and (e) participated in all-day mediations with two of the Settling Defendants with the assistance of highly respected mediators. The class representatives likewise were actively engaged, and adequately represented the class, as they: do not have any interests antagonistic to other Class Members; retained lawyers with the necessary qualifications, skill, and experience to lead this litigation; approved the filing of this action and the terms of the Settlements; and have been and continue to be prepared to represent the Class throughout the settlement-approval process.

19. Second, each Settlement was conducted at arm's length. The settlement negotiations were contentious and hard fought. Indeed, the parties reached settlements with eXp and Weichert only after hard-fought mediations with respected mediators and only finalized the proposed Settlement Terms through multiple rounds

of additional negotiations and drafting. No attorneys' fees were negotiated or agreed upon as part of the negotiations leading to the Settlement Agreements and there were no undisclosed side agreements.

20. Third, for the reasons stated above, the relief for the Class is fair and adequate. In addition, the eXp settlement, which includes payment of $34 million as well as practice changes, compares favorably in both economic and non-economic terms to settlements reached by the *Gibson* Plaintiffs and guarantees the Settlement Class tens of millions of dollars over the next two years, without the risk of prolonged litigation and accumulated expenses. Thus, the eXp Settlement is fair, adequate and reasonable in light of, among other things, its economic and non-economic components being on par with those reached by the *Gibson* Plaintiffs in the *Gibson* litigation. Similarly, the Weichert Settlement includes changes to its business practices as well as a settlement amount of $8.5 million. This amount is one of the highest figures relative to annual sales of any settling defendant in related litigations. In all, both Settlements are within the range of reasonableness and provide a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources.

21. The Parties naturally dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' educated assessments of

their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is prevailing on the merits at trial in this litigation and upholding their award on appeal. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). The same is true for post-trial motions and appeals. And being liable alone for the alleged damages in either of these cases could potentially bankrupt the Settling Defendants, rendering a significant recovery less likely even if Plaintiffs do prevail. Against this risk, the Settlements provide for a recovery of $44,050,000 from just four of many named Defendants in this action.

22. The Settlements are supported by the financial condition of the Settling Defendants, which lack the ability to pay the damages alleged if Plaintiffs were entirely successful at trial. As discussed above, to evaluate the Settling Defendants' financial condition, Class Counsel reviewed substantial financial information provided by each Settling Defendant, and published by eXp World Holdings, Inc. (which is publicly traded), to determine their ability to satisfy a judgment and have attested that the settlement amounts are reasonable in light of limitations on the Settling Defendants' ability to pay.

23. The fact that the Settlements include meaningful changes to the Settling Defendants' policies also supports the conclusion that the Settlements are fair, adequate and reasonable. Those changes include Settling Defendants, and their subsidiaries and affiliates, making the following practice changes, to the extent they are not already implemented, within three months of the Settlement Effective Date:

a. advise and at least yearly remind Settling Defendant's agents (including, without limitation, independent contractor real estate agents) that there is no requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, nonnegotiable or unilateral;

b. require that any Settling Defendant's agents (including, without limitation, independent contractor real estate agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer

representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Settling Defendants will require that any of their agents include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

c. prohibit all Settling Defendant agents (including, without limitation, independent contractor real estate agents) acting as cooperating broker, buyer broker or other buyer representative from advertising or otherwise representing that their services are free unless they will receive no financial compensation from any source for those services;

d. require that Settling Defendant-owned brokerages and their agents disclose any offer of compensation made in connection with each home marketed to prospective buyers in any format. For purposes of clarity, a seller's offer or "seller's concession" within the MLS fields that are not limited to or conditioned on it being used to compensate a cooperating broker, buyer broker or other buyer representative, but may be used as such, is not an "offer of compensation" for purposes of this subparagraph;

e. prohibit Settling Defendant agents (including, without limitation, independent contractor real estate agents) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, buyer broker or other buyer representative unless directed to do so by the client (and eliminate any internal Settling Defendant systems or technological processes that may currently facilitate such practices);

f. advise and at least yearly remind Settling Defendant company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

g. for each of the above points, for any Settling Defendant company-owned brokerages franchisees, and their agents, develop training materials consistent with the above relief and eliminate or modify any contrary training materials currently used.

24. Fourth, the Settlements treat Class members fairly and equitably relative to each other. Under the plain language of the Settlements, no Class member

is treated differently from any other. The practice change relief applies equally to all Class members, and as for monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. Further, Plaintiffs' counsel will be submitting an allocation plan to the Court that ensures an equitable, *pro rata* distribution of funds amongst the Settlement Class based on the amount of commissions paid by each Class member. Once that plan has been approved by the Court, additional notice and an opportunity to lodge objections will be provided to the Class members. The Court hereby expressly retains jurisdiction for purposes of approving and overseeing notice of the allocation plan, and for purposes of considering and ruling on any objections to same.

25. The Court-appointed notice and claims administrator, CPT, will work with Class Counsel in processing Class member claims and distributing relief. CPT has extensive experience in distributing relief in connection with large and complex class action settlements. CPT will be responsible for reviewing claim forms and evidence of purchase to determine whether a claim is an approved claim, and any claim that cannot be confirmed may be subject to challenge, nonpayment, or a reduced share of the available funds. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. Further, as discussed below, the attorneys' fee request is reasonable and in line with Eleventh Circuit precedent.

26. Finally, the fact that there has been only minimal opposition to the Settlements further supports final approval of the Settlements. Specifically, more than 750,000 individuals have submitted claims, while only two objections (encompassing four total objectors) have been filed,[2] and only 12 individuals requested exclusion from the class. Such minimal opposition to the Settlements supports granting final approval. *See In re Equifax*, 2020 WL 256132, at *10 (holding that "miniscule number of objectors in comparison to the class size is entitled to **significant weight** in the final approval analysis." (emphasis added)); *see also In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. ___, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (five timely objections out of tens of millions of Class Members supports approval).

## IV. The Court Overrules the Four Objections

27. The Court has carefully considered each of the timely filed objections. All objections are overruled. The Court finds that none of the objections provides a basis for denying final approval of the Settlements. *Ponzio*, 87 F.4th at 499 (recognizing that while "the proponents of a class action settlement bear the burden of developing a record demonstrating that the settlement is fair, reasonable, and adequate, objectors to the settlement have some obligations of their own"); *Carr v.*

[2] The four objections were lodged by parties to other competing class action cases wherein the objectors have sued some of the Settling Defendants for alleged wrongdoing identical (or highly similar) to that at issue in this Action.

*Ocwen Loan Servicing, LLC*, No. 1:13-CV-00732-JCF, 2014 WL 12860083, at *4 (N.D. Ga. Apr. 25, 2014) ("[O]nce preliminary approval has been granted to a settlement, the settlement 'is presumptively reasonable, and an objector must overcome a heavy burden to prove the settlement is unreasonable.'" (quoting *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002))).

28. Three objectors—all of whom are plaintiffs in the parallel *Gibson* class action against, among others, Settling Defendants Weichert and eXp—lodged objections challenging solely the settlements with eXp and Weichert on the grounds that: (a) the Settlements were the result of a "blind" reverse auction; and (b) Class Counsel is inadequate because they failed to conduct significant discovery in this case prior to negotiating the Settlements. (These objectors are hereinafter referred to as the "*Gibson* Plaintiffs").

29. The *Gibson* class action, pending in Missouri, alleges claims against Weichert and eXp that are virtually identical to those at issue in the present Action. The *Gibson* Plaintiffs unsuccessfully attempted to settle these claims with eXp and Weichert commencing prior to discovery in the *Gibson* Action, and they reached pre-discovery settlements with multiple other defendants in the *Gibson* Action. Counsel for the *Gibson* Plaintiffs previously litigated another class action in Missouri (*Burnett*) asserting similar claims as those at issue in the present Action, and also moved to intervene in the present Action.

30. With respect to their "blind" reverse auctions allegations, the *Gibson* Plaintiffs argue the Weichert settlement is inadequate because—while Weichert settled for $8.5 million here—Weichert previously offered the *Gibson* Plaintiffs $13 million to globally settle the claims against it. With respect to eXp, the *Gibson* Plaintiffs' argument is based on their assertion that—while eXp settled for $34 million here—a mediator told the *Gibson* Plaintiffs that he thought eXp might pay approximately $40 million to globally settle the claims against it. The *Gibson* Plaintiffs' reverse auction argument lacks merit.

31. Notably, the *Gibson* Plaintiffs cite no authority for the proposition that evidence of a so-called "blind" reverse auction establishes that a settlement is the product of collusion between counsel for the settling parties.

32. Further, eXp and Weichert never revealed to counsel for the Settling Class the content of their settlement negotiations with counsel for the *Gibson* Plaintiffs. As such, and based on the record, the eXp and Weichert Settlements were not and could not have been the result of a reverse auction. Indeed, as set forth above, the Settlements with Weichert and eXp were the result of, *inter alia,* arms-length bargaining, Class Counsel's review and analysis of substantial financial and other information concerning the Defendants, their alleged conduct, and their financial resources to reasonably pay a judgment, as well as mediations with three highly reputable neutrals.

33. *Gibson* Plaintiffs also argue the Class Counsel is inadequate because they failed to conduct significant discovery in this case prior to negotiating the Settlements. The *Gibson* Plaintiffs' position appears to be that the settlement figures they *hoped* to get during their unsuccessful negotiations/mediations with eXp and Weichert represent the ***only*** possible fair, reasonable and adequate resolution. That is not the law. Rather, even if the Court were to credit the *Gibson* Plaintiffs' view that the claims in the present Action should have been valued differently, approval is still appropriate if the court finds "that the relief afforded under the settlement agreement was adequate." *Ponzio*, 87 F.4th at 505; *see also, e.g., George v. Academy Mortg. Corp.*, 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019) (court "is not called upon to determine whether the settlement reached is the best possible deal"). Here, the Court finds that the relief afforded by the Settlements is fair, reasonable and adequate, for the reasons set forth above. Indeed, despite repeated requests, the *Gibson* Plaintiffs have failed to direct the Court to any authority—and the Court's own research has not revealed any—where a Court found that a reverse auction had occurred and denied final approval of a settlement under circumstances similar to those here.

34. Moreover, with respect to the eXp settlement, Class Counsel's request for 20% of the Settlement common fund in attorneys' fees, while the *Gibson* Plaintiffs would have requested 33.3%, will net the Class far more (around

$500,000) than the Class would have received *if* the *Gibson* Plaintiffs had been willing to settle (which they were not), and if they could have settled (which is unknown), with eXp for $40 million. As such, the *Gibson* Plaintiffs objections ring hollow.

35. Similarly unavailing are the *Gibson* Plaintiffs' allegations regarding the performance of Class Counsel in this Action. First, the *Gibson* Plaintiffs' assertion that Class Counsel failed to consider eXp's or Weichert's "ability to pay" is not only unsupported by any evidence, it is contrary to the record evidence showing that: (a) Plaintiffs here entered into confidentiality agreements with all Settling Defendants pursuant to which these defendants provided Class Counsel with, *inter alia*, financial statements, tax returns, financial reports, sales volumes, commission totals, listings, engagement agreements and/or other information to facilitate Class Counsel's analysis of the potential range of a fair and reasonable settlement; (b) Class Counsel spent many hours reviewing eXp's SEC filings, including the most recent 10-K (annual report) and 10-Q (quarterly report), which provided cash on hand, cash equivalents, debt and other information Class Counsel considered in their analysis of a reasonable and fair settlement range; (c) Class Counsel also researched these issues through other independent sources, such as Market Watch, T360 real estate reports, and Real Trends real estate reports; and (d) Class Counsel also met with Weichert's Chief Financial Officer and Corporate Counsel to review Weichert's

confidential financial information and obtain answers to Class Counsel's questions arising from their review of information Weichert provided, including information regarding Weichert's cash on hand and cash equivalents, debt, and other information relevant to Weichert's ability to pay.

36. Second, the *Gibson* Plaintiffs' assertion that Class Counsel rushed to settle these cases without adequate discovery also lacks merit for multiple reasons. Indeed, even though this Action has been stayed for the majority of its existence (thus preventing formal discovery), the Court expressly authorized and contemplated that the Parties would engage in settlement negotiations, mediations, and informal discovery to facilitate and consummate settlements while the case was stayed. (*See* ECF 69 at ¶ 3.)[3]

37. Finally, the *Gibson* Plaintiffs' objection regarding the lack of *formal* discovery rings hollow given that they too attempted to settle with Weichert and eXp ***before*** conducting any discovery. Thus, the *Gibson* Plaintiffs' own conduct shows that these cases have been in a settlement posture from their initial filing dates because of, among other things, the *Burnett* verdict's potential impact on liability and the substantial discovery regarding industry practices reportedly taken in that

---

[3] To that end, and as explained above, both eXp and Weichert voluntarily provided Plaintiffs and Class Counsel with the information needed to assess their ability to pay and arrive at fair, adequate, and reasonable settlement amounts, obviating the need to take discovery to uncover such information.

case. The *Gibson* Plaintiffs cannot dispute this given their pre-discovery settlements with multiple defendants in the *Gibson* Action.

38. The only other objector (James Mullis) seeks to carve out indirect purchaser buyer claims from the releases. But every Class member sold a home during the class period, and most also bought homes. After all, few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet Settling Defendants quite reasonably would have balked at paying large amounts in settlement with a seller class only to have the same people they just paid sue them again as buyers for the same alleged antitrust conspiracy.

39. The Parties solved this problem by crafting the releases to incorporate the Eleventh Circuit's "identical factual predicate" standard, and to otherwise comply with federal law. As explained by the United States Supreme Court, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996) (citation and internal quotation marks omitted). Under the identical-factual-predicate doctrine, "a settlement agreement may release claims that share a common nucleus of operative fact with the claims in the underlying litigation." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1090.

In practice, "the doctrine mirrors res judicata: a release may lawfully bar later actions arising from the same cause as the settled litigation." *Id.* (citing *TVPX ARS, Inc. v. Genworth Life & Annuity Ins.*, 959 F.3d 1318, 1325 (11th Cir. 2020)). Indeed, the Eleventh Circuit has recognized "that res judicata applies not only to the precise legal theory presented in the previous litigation but to all legal theories and claims arising out of a common nucleus of fact." *Id.* (citing *Trustmark Ins. v. ESLU, Inc.*, 299 F.3d 1265, 1270 n.3 (11th Cir. 2002)). Here, the home purchaser claims advanced in the *Batton* and *Davis* actions arise under the same alleged anticompetitive conduct—principally, the NAR's so-called Mandatory Offer of Compensation Rule—and the same theory and factual predicate at issue in this case.

40. Each Settlement incorporates the appropriate standard by including the following release language:

> Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money or for injunctive, declaratory, or for other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, actual or contingent, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall or may have and that have accrued as of the date of final approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Action and similar state and federal statutes. In connection therewith, upon the

> Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of final approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of any doubt, this release extends to, but only to, the fullest extent permitted by law.

The Settlement Agreements define "Released Claims" as "any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Action based on any or all of the same factual predicates for the claims alleged in the Action, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home."

41. The Parties validly restricted the releases' scope. The Class members would have been bound by res judicata if the case had proceeded to final judgment, and the releases impose no greater preclusive effect from settlement. Every Class member was free to weigh their competing claims and make a choice. They could have opted out and would be free to pursue buyer claims. And people with buyer-only claims are completely unaffected because they are not part of the class.

42. Mr. Mullis argues that the settlements release indirect purchaser buyer claims "for no additional consideration." Having properly limited the scope of the releases based on the "identical factual predicate" standard, however, the Court finds the parties were under no further obligation to assign separate settlement values to

every distinct claim that Class members might have asserted.

43. Mr. Mullis also takes issue with the equitable treatment of some theoretical Class members who separately purchased homes. However, as the Court has already recognized, the entire Settlement Class, including Mullis, receives significant benefits under the Settlement Agreements for claimed damages sustained listing and selling homes on an MLS. Moreover, the entire Settlement Class, again including Mullis, benefits from injunctive relief in the form of practice changes imposed upon the Settling Defendants, many of which expressly concern the conduct of buyer brokers (*see, e.g.*, subparagraphs 23.b, c, e & f above). To the extent certain Class members who also separately purchased homes are releasing claims framed as "home purchaser claims," they are not treated inequitably under controlling precedent. In compliance with prevailing federal law and within the requirements established by the Eleventh Circuit, Plaintiffs properly limited the scope of the Releases to the "identical factual predicate" and are under no further obligation to assign separate settlement values to every distinct claim that class members might have asserted.

## V. Final Approval of the Settlements

44. The Court finds the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court reaffirms the appointment of the law firms of

Knight Palmer LLC and Kabat Chapman & Ozmer LLP as Co-Lead Counsel for the Settlement Class ("Class Counsel").

45. The 12 persons identified in the Supplemental Declaration of Carole Thompson (DE 221-1) have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class and are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlements, whether monetary or otherwise. Nothing in this order should be construed as a determination by this Court that the excluded persons and entities are members of the Settlement Class or that they meet other prerequisites, such as standing, for bringing claims alleged in this Action. Each Class member who is not listed in Exhibit I to the Thompson Declaration is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against Released Parties. The Court specifically approves these releases as set forth in the Settlement Agreements.

46. Members of the Settlement Class, unless they excluded themselves from the Settlement Class, are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties, which include Settling Defendants' franchisees and affiliated brokerages, and agents affiliated with those franchisees or affiliated brokerages. *See* 28 U.S.C. § 1651. Released Claims include claims that

arise from or relate to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home. For the avoidance of doubt, this injunction extends to claims arising from or relating to transactions where Class members either sold or purchased a home on any multiple listing service nationwide, regardless of affiliation or association with NAR or not. This injunction does not extend to any individual claims that a plaintiff or class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

47. This Order does not settle or compromise any claims by Class Representatives or the Settlement Class against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

48. Settling Defendants shall issue payment in accordance with the Settlement Agreements.

## VI. The Court Approves Class Counsel's Request for Attorneys' Fees

49. Class Counsel has adequately represented the Class. Their application

for an award of attorneys' fees and reimbursement of costs as set forth in the Motion for Attorneys' Fees and Costs (DE 188) is hereby approved and fees and reimbursements shall be paid in accordance with that Motion.

50. The Supreme Court has consistently held that the percentage-of-recovery approach is an appropriate methodology for assessing fees. *See, e.g., Sprague*, 307 U.S. at 164–67; *Central R.R. & Banking Co.*, 113 U.S. at 123; *Greenough*, 105 U.S. at 533. In *Boeing*, the Supreme Court affirmed a ruling that absentee class members had received a benefit within the meaning of the common-fund doctrine and addressed "whether a proportionate share of the fees awarded to lawyers who represented the successful class may be assessed against the unclaimed portion of the fund created by a judgment." *Boeing Co.*, 444 U.S. at 473. The Court held the attorneys were entitled to a reasonable fee from the whole fund, regardless of claims rate:

> The members of the Class, whether or not they assert their rights, are at least the equitable owners of their respective shares in the recovery [and whether they claim the money or not] cannot defeat each class member's equitable obligation to share the expenses of litigation.

*Id*. at 481-82 (1980). Put another way: "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class[.]" *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). Following the Supreme Court's decision in *Blum*, the Eleventh Circuit expressly held that "in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. In recent

years, the Eleventh Circuit reaffirmed its holding in *Camden I* that the percentage method is the appropriate analysis in common fund settlements such as this one and the district court is not required to perform a lodestar analysis. *In re Equifax Inc.*, 999 F.3d at 1278-81.

51. This Court is required to "articulate the specific reasons for selecting the percentage upon which the attorneys' fee award is based," and, in so doing, "should identify all of the factors upon which it relied and explain how each factor affected its selection of the percentage of the fund awarded as fees." *Camden I*, 946 F.2d at 775. The factors the Court should consider are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.

*Id*. at 772 n.3 (quoting *Johnson,* 488 F.2d at 717-19).

52. Class Counsel litigated this case aggressively and comprehensively, pursuing this action on a purely contingent fee basis at a significant risk. In pursuing this action, Class Counsel performed substantial legal work that drove the successful settlement of this case, including: pre- and post-litigation research into Settling Defendants and the other previously named Defendants in the case, legal

strategizing, complaint drafting, reviewing and analyzing financial and other records from the Settling Defendants, supporting the *Gibson* Plaintiffs' efforts to consolidate this and similar cases in an MDL, preparing for and participating in mediation, engaging in significant motion practice with respect to the *Gibson* Plaintiffs' attempt to intervene in this case, other motion practice that resulted in the Preliminary Approval of the Settlements and certification of the Class, overseeing the notice campaign, responding to objections, and otherwise securing the substantial benefits of the Settlements for the Class.

53. This was a complex antitrust case that involved substantial research and legal strategy to navigate successfully. As detailed above, to identify the appropriate defendants in the case and then to arrive at reasonable settlement amounts for each of the four Settling Defendants, Class Counsel engaged in significant pre- and post-filing research and review of voluminous financials and other documents. Because antitrust claims are especially complex, expensive, and difficult to prosecute, courts have recognized that a fee as high as one-third of the fund is often appropriate. *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-CV-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (approving fee of one-third of the common fund and noting that "as this Court has observed, antitrust class actions are especially complex and difficult"); *In re Motorsports Merchandise Antitrust Litig.*,112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000) ("An antitrust class action is

arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.”).

54. Class Counsel have substantial experience in litigating class actions, mass torts and other complex litigation. (See ECF 136-1 ¶¶ 2–4; ECF 136-9 ¶¶ 2–5; ECF 136-10 ¶¶ 2–9 (detailing credentials and prior class-action experience of Class Counsel.)) Given the complexity of the factual and legal issues involved in this matter, Class Counsel’s competence and experience in class actions clearly was a significant factor in obtaining the Settlements and the ultimate results achieved for the benefit of the Settlement Class.

55. Class Counsel’s excellent performance in this Action is further demonstrated by the fact that the Settling Defendants are represented by exceptionally capable counsel from no fewer than eight different law firms, including large national firms like Alston & Bird, LLP, Armstrong Teasdale LLP, Saul Ewing LLP, Vinson & Elkins, and Womble Bond Dickinson (US) LLP, as well as strong local firms like Berman Fink Van Horn, P.C., and Weissman Law. The firms representing Settling Defendants are highly competent and professional adversaries, many of whom have enormous resources at their disposal that outstrip those available to Class Counsel. *See, e.g.*, *Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D. Fla. 1992) (“[I]n assessing quality, the Court has considered the quality of the *opposition* as well as the standing of plaintiff’s counsel.”); *Allapattah Servs., Inc.*

*v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1202 (S.D. Fla. 2006) ("the Eleventh Circuit recognized that 'other pertinent factors are . . . whether there are any substantial objections by class members or other parties to the settlement terms or the fees required by counsel.'" (quoting *Camden I*, 946 F.2d at 775)). Moreover, Class Counsel have been required to respond to and defend against collateral attacks on their settlement efforts by the *Gibson* Plaintiffs, who: (1) attempted to intervene in this Action for the purpose of having it transferred to the Western District of Missouri and consolidated with the *Gibson* action; and (2) vigorously opposed approval of the eXp and Weichert settlement agreements.

56. Additionally, Class Counsel were restricted from other employment given the amount of time they committed to this action, particularly given the fact that Class Counsel are comprised of two firms with just over 30 attorneys between them. *See Allapattah*, 454 F. Supp. 2d at 1209 (S.D. Fla. 2006) ("This factor requires the dual consideration of otherwise available business which is foreclosed because of conflicts of interest arising from the representation, and the fact that once the employment is undertaken, the attorney is not free to use the time spent on the case for other purposes.").

57. "The customary fee in class actions is a contingency fee, because it is not practical to find any individual that will pay attorneys on an hourly basis to prosecute the claims of numerous strangers and take on the significant additional expenses of

fighting with the defendants over class certification." *Columbus Drywall*, 2012 WL 12540344, at *4; *Ressler*, 149 F.R.D. at 654 ("The 'customary fee' in a class action lawsuit is contingent, since virtually no individual plaintiff has a large enough monetary stake in the litigation to justify charging on an hourly basis."). Here, Class Counsel requests a fee of 20% of the Settlement Amounts. This percentage falls at the low end of the benchmark range under *Camden I* and its progeny. The fee at issue (20% of fund) is exceedingly reasonable, as other courts have approved similar or even greater fees under similar circumstances.

58. As of the time of Plaintiffs' Motion for Final Approval, Class Counsel had spent 1,496.1 attorney hours and 59 non-attorney hours in prosecuting this case. As discussed above, Class Counsel's efforts resulted in not only significant financial relief for the class ($44.05 million) but also the requirement that Settling Defendants adopt and implement certain practice changes that will benefit the Class members and countless other future home sellers. As courts in this Circuit have recognized, any "non-monetary benefits conferred upon the class by the settlement," are properly considered in determining the appropriate percentage of the fund to award as attorneys' fees. *Allapattah*, 454 F. Supp. 2d at 1202 (quoting *Camden I*, 946 F.2d at 775). In short, Class Counsel have achieved an impressive result.

59. Class Counsel had to commit an unknown, but substantial, number of hours and monetary expenses to a case where the outcome was entirely uncertain.

*See Pinto*, 513 F. Supp. 2d at 1340 ("The relevant risks must be evaluated from the standpoint of Plaintiffs' counsel as of the time they commenced the suit and not retroactively with the benefit of hindsight."). Here, Class Counsel undertook significant risk in taking this case on contingency and agreeing to commit substantial time and effort to a case whose outcome was anything but certain. Additionally, the outcomes of prior similar actions were no guarantee that (a) the Settling Defendants would be willing to settle their claims rather than aggressively litigate this case through trial, or (b) that any eventual trial would have resulted in a favorable result for Plaintiffs.[4] *See Cardizem*, 218 F.R.D. at 523.

60. As explained above, an award of 33.33% (*i.e.*, one-third) of the common fund is extremely common, particularly in complex antitrust actions. Indeed, counsel for the *Gibson* Plaintiffs' have regularly requested and been granted fees totaling 33.33% of the common fund in the settlements they have reached. These fee awards demonstrate Class Counsel's petition for a fee of 20% of the fund is not only at the lowest end of this Circuit's "benchmark," it is also quite reasonable given the fees awarded in similar cases.

[4] To the extent anyone claims that Plaintiffs in this case took on less risk than the *Gibson* Plaintiffs, the requested fee here reflects that reduced risk, as the 20% of the fund that Class Counsel seeks here is far less than the 33.33% the court approved in the *Gibson* action, which involved numerous settlements reached at a similar stage of litigation as this action. (*See, e.g., Gibson* ECF 530 (Order Granting Final Approval of NAR Settlement.)

61. The Court also grants Plaintiffs' request for their costs. The expenses submitted were reasonable expenses in such a large and complex litigation.

62. The Settlement Administrator shall be paid in accordance with the Settlement Agreements.

63. The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs. Co-Lead Counsel are, in accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

64. If they have not done so already, Co-Lead Counsel are directed to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review. The proposed plan of allocation must be provided to all Class members who submit a claim to provide those individuals an opportunity to comment on the plan. After the plan of allocation is proposed and an opportunity to comment has been provided, the Court will evaluate the proposed plan and any objections thereto. The Court's review of the plan of allocation will be conducted separately from this final review of the Settlements. The Court believes that this additional layer of protection to the Class

bolsters the Court's finding that the Settlements treat class members equitably.

65. Pursuant to Federal Rule of Civil Procedure 54(b), this Court directs entry of final judgment of dismissal with prejudice and without costs (except as provided in the Settlements) as to the Settling Defendants.

66. Settling Defendants have denied any liability, fault, or wrongdoing of any kind in connection with the allegations in the Action, and as such, neither the Settlements, nor any of their respective terms or provisions, nor any of the negotiations or proceedings connected with the Settlements shall be construed as an admission or concession of the truth of any of the allegations, or of any liability, fault, or wrongdoing of any kind by Settling Defendants.

67. The Court expressly retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer and enforce the Settlements (including with respect to the scope of the Settlement Class, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process, in accordance with the Settlements, for the benefit of the Settlement Class. The Court does this for the purpose of satisfying the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), concerning the obligation of a Court entering a settlement agreement to speak clearly when it wishes to retain jurisdiction.

**SO ORDERED** this ___ day of November, 2025.

_______________________________
HONORABLE MARK H. COHEN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF GEORGIA