IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| 1925 HOOPER LLC; ROBERT J. ARKO; and ANDREW M. MOORE, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS; HIGHER TECH REALTY, LLC d/b/a MARK SPAIN REAL ESTATE; WEICHERT OF NORTH AMERICA, INC.; EXP WORLD HOLDINGS, INC.; HAMILTON DORSEY ALSTON COMPANY, INC.; BEACHAM & COMPANY, LLC; TRACEY COUSINEAU REAL ESTATE, LLC; SANDERS REALTY HOLDINGS, LLC; BOLST, INC. d/b/a THE JUSTIN LANDIS GROUP; CHAPMAN HALL REALTORS, INC.; SIGNATURE PROPERTIES GROUP, INC.; METHOD REAL ESTATE GROUP, LLC d/b/a METHOD REAL ESTATE ADVISORS; PATH & POST, LLC d/b/a PATH & POST REAL ESTATE; DUCKWORTH PROPERTIES, LLC; AF REALTY GROUP, LLC; GREATER ATLANTA REAL ESTATE | CIVIL ACTION FILE<br><br>NO. 1:23-CV-5392-MHC |

GROUP, LLC d/b/a MAXIMUM
ONE REALTY; GREATER
ATLANTA REALTY HOLDINGS
CORPORATION d/b/a MAXIMUM
ONE REALTY; and ATLANTA
COMMUNITIES REAL ESTATE
BROKERAGE, LLC,

**Defendants.**

## ORDER GRANTING FINAL APPROVAL OF SETTLEMENT, CERTIFYING SETTLEMENT CLASS, AND AWARDING ATTORNEYS' FEES AND EXPENSES

This matter is before the Court on Plaintiffs' Motion for Final Approval of

Settlements with Defendants Higher Tech Realty, LLC d/b/a Mark Spain Real

Estate ("Higher Tech"), eXp World Holdings, Inc. ("eXp"), Weichert of North

America, Inc. ("Weichert"), and Atlanta Communities Real Estate Brokerage, LLC

("Atlanta Communities") (collectively, the "Settling Defendants") [Doc. 199];

Plaintiffs' Motion for Award of Attorneys' Fees and Expenses [Doc. 188];

Weichert's Motion for Joinder in Plaintiffs' Motion for Final Approval ("Weichert

Mot. for Joinder") [Doc. 200]; eXp's Motion for Joinder in Plaintiffs' Motion for

Final Approval ("eXp Mot. for Joinder") [Doc. 203]; and Plaintiffs' Motion to

Preliminarily Approve Plan of Allocation for Settlement [Doc. 232]. The terms of

the proposed class action settlements Plaintiffs reached with the Settling

Defendants are set out in the respective settlement agreements. Settlement

2

Agreement with eXp (Dec. 9, 2024) ("eXp Settlement Agreement") [Doc. 136-3]; Settlement Agreement with Weichert (Dec. 11, 2024) ("Weichert Settlement Agreement") [Doc. 136-4]; Settlement Agreement with Higher Tech (Dec. 17, 2024) ("Higher Tech Settlement Agreement") [Doc. 136-2]; Settlement Agreement with Atlanta Communities (Jan. 3, 2025) ("Atlanta Communities Settlement Agreement") [Doc. 136-5].

For the reasons set forth below, and after considering the entire record, the record of the Fairness Hearing held on October 28, 2025, and the post-hearing supplemental submissions of the parties and objectors, the Court hereby **GRANTS** the Motion for Final Approval of Settlements with Defendants, **GRANTS** Plaintiffs' Motion for Award of Attorneys' Fees and Expenses, **GRANTS** the Motions for Joinder, **GRANTS** Plaintiffs' Motion to Preliminarily Approve Plan of Allocation for Settlement, and issues the following ruling on the pending objections that have been filed in this case.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This class action asserts antitrust violations arising out of an alleged nationwide conspiracy by the National Association of Realtors ("NAR") and residential real estate brokerages across the country.  Am. Class Action Compl.

3

[Doc. 6].[1] The alleged conspiracy involved a concerted effort by NAR and the brokerages to artificially inflate broker compensation at the expense of the brokerages' clients who were selling homes. Am. Compl. ¶¶ 1-6, 68-142. Plaintiffs allege that NAR created and implemented rules requiring home sellers to pay commissions to the broker or agent representing the buyer, which caused home sellers to pay total commissions at inflated rates. Id. NAR and the brokerages allegedly accomplished this by requiring their customers, including Plaintiffs and the class they purport to represent, to pay the commissions of both the listing agents and the buyer agents in order for their residential properties to be listed on the Multiple Listing Services (the "MLSs") in the United States. Id. More specifically, as a prerequisite to listing any residential property on the MLSs, seller brokers were compelled to adhere strictly to NAR rules, including the "Mandatory Offer of Compensation Rule" within a seller's listing agreement which dictated the

---

[1] The Complaint [Doc. 1] was amended on December 6, 2023, to, among other things, change the names of the parties. Am. Compl. The Amended Complaint is the operative complaint in this case.

4

mandatory terms of compensation that must be paid as commissions not only to the seller's broker, but also to the buyer's broker. Id.

The Amended Complaint includes claims for violations of (1) the Sherman Act, 15 U.S.C. § 1 (Count One), (2) the Georgia Antitrust Act, O.C.G.A § 12-8-2 et seq. (Count Two), (3) the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A § 10-1-372(a) (Count Three), and (4) the Georgia Fair Business Practices Act, O.C.G.A § 10-1-393(a) (Count Four). Am. Compl. ¶¶ 173-202.

Shortly after this case was filed, on February 14, 2024, the Court granted a stipulated motion to stay all proceedings and deadlines in this case as to a subset of defendants pending a decision by the U.S. Judicial Panel on Multidistrict Litigation (the "JPML") on a motion to transfer this case to the Western District of Missouri to join with nearly twenty other antitrust cases across the nation alleging similar conspiracies under Section 1 of the Sherman Act. Feb. 14, 2024, Order [Doc. 17].[2] The stay was subsequently modified to include all defendants. Mar. 6, 2024, Order [Doc. 48]. The stay was set to expire sixty days after the entry of an order from the JPML on the motion to transfer. Id. The JPML entered an order denying the

---

[2] The other cases included <u>Gibson v. Nat'l Ass'n of Realtors, et al.</u>, No. 4:23-cv-00788 (W.D. Mo.) (the "<u>Gibson</u> Action"), and <u>Umpa v. Nat'l Ass'n of Realtors, et al.</u>, No. 4:23-cv-00945 (W.D. Mo.).

motion for centralization on April 12, 2024, triggering the stay to expire on June 12, 2024. Notice of Ruling by the JPML on the Mot. to Transfer [Doc. 55]. However, on May 20, 2024, before this case recommenced, the parties filed a Joint Motion to Stay which notified the Court that a nationwide settlement with NAR ("NAR settlement") had been preliminarily approved in Burnett v. The National Association of Realtors, No. 4:19-cv-00332 (W.D. Mo.) (the "Burnett Action").[3] Joint Mot. and Stipulation to Stay [Doc. 68]. The parties sought a stay for sixty days so that the defendants who were not automatically released under the NAR settlement could determine whether to opt in. Id. at 4-5. The Court granted the motion and stated that during the stay Plaintiffs and remaining Defendants not considered released parties "may engage in settlement discussions, negotiations, or mediations, and/or exchange of informal discovery to facilitate settlement." May 20, 2024, Order [Doc. 69] at 3.

---

[3] The Settling Defendants represent the only remaining Defendants in this case that either were not included in the NAR Settlement or have not formalized settlement agreements with counsel for the Gibson plaintiffs. Decl. of Bryan M. Knight (Jan. 7, 2025) ("Jan. 7 Knight Decl.") [Doc. 136-1] ¶ 8. Counsel for Plaintiffs represents that "approval of the settlement agreements with the Settling Defendants in this action will conclude the litigation before this Court." Id.

6

On October 7, 2024, Plaintiffs announced that they settled all claims asserted against eXp [Doc. 88].[4] Approximately two weeks later, on October 22, 2024, Don Gibson, Laura Criss, John Meiners, and Daniel Umpa[5] filed a Motion to Intervene and Transfer Case [Doc. 94]. The Gibson Plaintiffs argued, inter alia, that the proposed settlement with eXp is on terms that do not provide sufficient relief to the nationwide class it purports to release, which includes the Gibson Plaintiffs. Mem. in Supp. of Mot. to Intervene and to Transfer Case [Doc. 94-1] at 9. The Gibson Plaintiffs also argued that Plaintiffs' counsel and eXp's counsel engaged in a "reverse auction" and consequently reached a settlement agreement that does not provide sufficient value for the class. Id. at 10-13. This Court denied the Motion to Intervene and Transfer. Mar. 28, 2025, Order [Doc. 174]. Among other things, the Court found that the Gibson Plaintiffs failed to demonstrate that they would suffer any prejudice if the Court did not grant their Motion to Intervene and Transfer because the settlements reached between Plaintiffs and Settling

---

[4] Plaintiffs also announced that they settled all claims asserted against Higher Tech on October 16, 2024 [Doc. 93], against Weichert on November 8, 2024 [Doc. 110], and against Atlanta Communities on December 10, 2024 [Doc. 130].

[5] Don Gibson, Laura Criss, John Meiners, and Daniel Umpa ("the Gibson Plaintiffs") are all Plaintiffs (and proposed class representatives) in the Gibson Action pending in the Western District of Missouri. Mot. to Intervene and Transfer at 1.

7

Defendants must be approved by this Court and the <u>Gibson</u> Plaintiffs could lodge any objections they have to the settlements as a part of the Rule 23 class action Fairness Hearing. <u>Id.</u> at 22-28.

On May 23, 2025, this Court issued an order preliminarily approving the Settlement Agreements and directed that notice issue to the settlement class. May 23, 2025, Order ("Preliminary Approval Order") [Doc. 183]. The Preliminary Approval Order provisionally appointed Knight Palmer LLC and Kabat Chapman & Ozmer LLP as class counsel (hereinafter "Class Counsel"). <u>Id.</u> at 4. Notice to the settlement class commenced on July 22, 2025, and informed members of the settlement class about their opportunity to opt out or object to the settlements. Decl. of Carole Thompson (Sept. 25, 2025) ("Thompson Decl.") [Doc. 199-2] ¶¶ 13, 15, 20, 23-25, 33-34. Four potential class members, three of whom are plaintiffs in the <u>Gibson</u> Action, objected to the Settlement Agreements in two separate objections filed with the Court. Objs. of Don Gibson, Jeremy Keel, and Daniel Umpa of Settlement With eXp and Weichert (the "<u>Gibson</u> Objs.") [Doc. 192]; Obj. to Final Approval of Settlement [Doc. 195] filed by James Mullis (the "Mullis Obj.").

## II.    TERMS OF THE SETTLEMENT

The following are the material terms of the Settlement Agreements:

8

## A.    The Settlement Class

The Settlement Agreements at issue define the "Settlement Class" as "[a]ll persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019[6] and date of Class Notice."[7] Higher Tech Settlement Agreement ¶ 15; eXp Settlement Agreement ¶ 15; Weichert Settlement Agreement ¶ 14.  The Settlement Agreements provide for a nationwide class with a corresponding nationwide settlement and release.  Higher Tech Settlement Agreement ¶ 15; eXp Settlement Agreement ¶ 15; Weichert

---

[6] The Settlement Class in the Atlanta Communities Settlement Agreement has a slightly shorter period of time, defining the settlement class as "all persons who sold a home that was listed on a MLS anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home from November 22, 2019 to the date of Class Notice."  Atlanta Communities Settlement Agreement ¶ 14.  The discrepancy in the date listed in the Atlanta Communities' Settlement Class definition is immaterial as any person who is a member of the Settlement Class as defined by the Atlanta Communities Settlement Agreement would necessarily be a member of the more broadly defined Settlement Class in the Weichert, eXp, and Higher Tech Settlement Agreements.  Moreover, no party has raised any objection to this discrepancy, nor was any objection made during the Fairness Hearing.

[7] The date of Class Notice is July 22, 2025.  See Preliminary Approval Order at 7 (defining the Notice Date as "60 days after the Court enter[ed] the Preliminary Approval Order."); see also Thompson Decl. ¶¶ 13, 15, 20, 23-25 (indicating that notice was provided on July 22, 2025).

Settlement Agreement ¶ 14; Atlanta Communities Settlement Agreement ¶ 14. The Settlement Class encompasses all persons who sold homes on any multiple listing service nationwide, regardless of affiliation with NAR and regardless of whether the Settlement Class member used one of the Settling Defendants as a broker.  Id.

## B.    Settlement Amounts

The Settlement Agreements provide that the Settling Defendants will pay the following amounts for the benefit of the Settlement Class:

eXp: $34 million, eXp Settlement Agreement ¶ 18;

Weichert: $8.5 million, Weichert Settlement Agreement ¶ 17;

Atlanta Communities: $800,000, Atlanta Communities Settlement Agreement ¶ 20; and

Higher Tech: $750,000, Higher Tech Settlement Agreement ¶ 21.

These amounts are inclusive of all costs of settlement, including payments to class members (including Plaintiffs), attorneys' fees and costs, and costs of notice and claims administration.  Id.

The Settlement Amounts are non-reversionary; that is, once the Settlement Agreements are finally approved by the Court and after administrative costs, litigation expenses, and attorney fees are deducted, the net funds will be distributed

10

to members of the Settlement Class with no amount reverting back to the Settling Defendants, regardless of the number of opt-outs or claims made. Higher Tech Settlement Agreement ¶ 40; eXp Settlement Agreement ¶ 38; Weichert Settlement Agreement ¶ 36; Atlanta Communities Settlement Agreement ¶ 39.

## C.    Practice Changes

The Settlement Agreements require eXp, Weichert, Atlanta Communities, and Higher Tech to make numerous practice changes, to the extent they are not already implemented, within three (3) months after the Settlement Agreements become effective and which will sunset several years after the Effective Date[8] of the Settlement Agreements. Higher Tech Settlement Agreement ¶¶ 51-52 (identifying practice changes for Higher Tech, including the requirement that Higher Tech "[d]isclose to prospective sellers and buyers in conspicuous language that Higher Tech's commissions are not set by law and are fully negotiable."); eXp Settlement Agreement ¶¶ 49-50 (identifying practice changes for eXp requiring, inter alia, "that any eXp agents . . . disclose to prospective home sellers and buyers

---

[8] The Settlement Agreements define Effective Date to mean the date when the Court enters a final judgment approving the Settlement Agreements and the time to appeal any such judgment has expired. Higher Tech Settlement Agreement ¶ 6; eXp Settlement Agreement ¶ 7; Weichert Settlement Agreement ¶ 6; Atlanta Communities Settlement Agreement ¶ 7.

11

and state in conspicuous language that broker commissions are not set by law and are fully negotiable."); Weichert Settlement Agreement ¶¶ 47-48 (identifying practice changes for Weichert requiring, for example, "that any Weichert company-owned brokerages and their agents . . . disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable."); Atlanta Communities Settlement Agreement ¶¶ 50-52 (identifying practice changes for Atlanta Communities, including the requirement that "[w]hen acting as a seller broker, eliminate any requirement of making offers of compensation to buyer brokers or other buyer representatives . . ., and eliminate any requirement that such offers, if made, must be blanket, unconditional, or unilateral.").

### D.    Class Notice and Claims Administration

Plaintiffs and the Settling Defendants agreed to retain CPT Group, Inc. ("CPT") as the notice and claims administrator.  Higher Tech Settlement Agreement ¶ 25; eXp Settlement Agreement ¶ 22; Weichert Settlement Agreement ¶ 22; Atlanta Communities Settlement Agreement ¶ 24.  As the notice and claims administrator, CPT was responsible for receiving claims submitted by members of the Settlement Class, determining whether all submitted information was complete and accurate, and effectuating class notice. Id. Plaintiffs submitted multiple

12

declarations from Carole Thompson, the Associate Director of Case Management at CPT, which summarize the notice provided to members of the Settlement Class and the resulting claims, opt-outs, and objections. See generally Thompson Decl.; Suppl. Decl. of Carole Thompson (Oct. 20, 2025) ("Suppl. Thompson Decl.") [Doc. 221].

Notice was provided to members of the Settlement Class through a combination of direct mail, electronic mail, text messaging, social media, digital and print publication, and other means. Thompson Decl. ¶¶ 18-27. In addition to providing direct and other notice, CPT established a settlement website, which contained electronic versions of the form used to submit claims online or via regular mail, the full Settlement Agreements, important court documents, and answers to frequently asked questions. Id. ¶¶ 15-17. Members of the Settlement Class had an opportunity to exclude themselves from the settlements or object to their approval; moreover, the procedures and deadlines for filing opt-out requests and objections were referenced in all forms of the notice and on the website created by CPT. Id. ¶¶ 33-34.

E.    **Attorneys' Fees and Expenses**

Class Counsel have applied for an award of attorneys' fees in the amount of $8,810,000 and reimbursement of expenses in the amount of $29,312.62. Pls.'

13

Mot. for Award of Attys' Fees & Expenses. These amounts are in accordance with the Settlement Agreements, which authorize Class Counsel to seek to recover their attorneys' fees and costs incurred in prosecuting the Action. Higher Tech Settlement Agreement ¶¶ 34, 38; eXp Settlement Agreement ¶¶ 32, 35; Weichert Settlement Agreement ¶¶ 30, 33; Atlanta Communities Settlement Agreement ¶ 37.

## F.    Releases

The Settlement Agreements provide that, upon the Effective Date, Plaintiffs and the Settlement Class will release and discharge the Settling Defendants, and their respective corporate parents, subsidiaries, related entities, affiliated franchisees, independent contractors, and other representatives from any and all claims "arising from or relating to conduct that was alleged or could have been alleged in this case, based on any or all of the same factual predicates for the claims alleged in this case, including but not limited to commissions negotiated, offered, obtained, rebated, or paid to brokerages in connection with the sale of any residential home." Higher Tech Settlement Agreement ¶ 18; eXp Settlement Agreement ¶ 11; Weichert Settlement Agreement ¶ 10; Atlanta Communities Settlement Agreement ¶ 17. The Settlement Agreements, however, do nothing to abrogate the rights of any member of the Settlement Class to recover from any other defendants. Higher Tech Settlement Agreement ¶ 62; eXp Settlement

14

Agreement ¶ 59; Weichert Settlement Agreement ¶ 57; Atlanta Communities Settlement Agreement ¶ 61.  The Settlement Agreements also expressly exclude from the release a variety of individual claims that members of the Settlement Class may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action).  Higher Tech Settlement Agreement ¶ 31; eXp Settlement Agreement ¶ 28; Weichert Settlement Agreement ¶ 28; Atlanta Communities Settlement Agreement ¶ 30.  Additionally, the Settlement Agreements exempt any individual claims that a member of the Settlement Class may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a member of the Settlement Class paid an excessive commission or home price due to the claims at issue in these Actions.  Id.

## III.   FINAL APPROVAL OF PROPOSED SETTLEMENT AGREEMENTS

After consideration of the Settlement Agreements, the arguments and authorities presented by the parties in their motions and briefing, all objections and comments regarding the Settlement Agreements, the arguments at the Fairness Hearing held on October 28, 2025, and the entire record in this case, the Court reaffirms its findings in the Preliminary Approval Order and finds that the

Settlement Agreements satisfy the notice requirements and are fair, reasonable, and adequate.

### A. The Notice Provided to the Settlement Class Was Sufficient Under Rule 23.

The Court finds that notice given to the Settlement Class fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable. Postcards were mailed to 140,211 members of the Settlement Class for whom Plaintiffs obtained direct contact information from the Settling Defendants. Thompson Decl. ¶¶ 18-19. Emails were sent to 224,578 members of the Settlement Class for whom Plaintiffs obtained email addresses from the Settling Defendants. Id. ¶¶ 20-21. Further, CPT sent notices via text message to 335,272 Class Members for whom a cellular telephone number was available. Id. ¶ 23. Additionally, CPT's website, social media, and other digital notice efforts generated 31,198,633 impressions, prompting approximately 113,513 clicks to view the settlement website. Id. ¶ 24. CPT distributed a press release including a summary of the case, a toll-free number, case email address, and the settlement website to 900 press outlets with a total potential audience of over 74,800,000 million individuals. Id. ¶ 25. The press release was viewed approximately 5,800 times and resulted in 1,189 click-throughs to the settlement

16

website.  Id.  In addition to the formal class notice process, and beyond the paid press release, CPT made postings on TopClassActions.com and ClassAction.org, which generated additional traffic to the settlement website; for example, the posting on TopClassActions.com had 61,233 page views and 9,641 "file a claim" button clicks.  Id. ¶ 27.  CPT also caused the settlement notice to be published one time in the September 2025 issue of Better Homes & Gardens magazine.  Id. ¶ 26.  The settlement website CPT established and referenced in the various notices had 69,491 unique visitors and 256,573 views.  Id. ¶ 17.

At the expiration of the claims period on September 20, 2025, CPT received 752,764 claims.  Suppl. Thompson Decl. ¶ 5.  There were twelve requests for exclusion and two objections (consisting of four objectors).  Id. ¶¶ 8-9.

The Court finds that the notice provided to members of the Settlement Class fully and accurately informed members of the Settlement Class of all material elements of the Settlement Agreements.  The Settlement Class members received notice of: (a) the pendency of this case; (b) the terms of the proposed Settlement Agreements, including the released claims, released parties, and the releasing parties; (c) their rights under the proposed Settlement Agreements, including how to receive the benefits offered by the Settlement Agreements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlement

17

Agreements; (e) their right to object to any aspect of the proposed Settlement Agreements; (f) their right to appear at the Final Approval Hearing conducted on October 28, 2025; (g) Class Counsel's request for attorneys' fees and expenses; and (h) the binding effect of this Order Approving Settlement on all persons who did not timely exclude themselves from the Settlement Class.

The Court finds that the form and methods of notifying members of the Settlement Class of the terms and conditions of the proposed Settlement Agreements met the requirements of Rule 23(c)(2) of the Federal Rules of Civil Procedure, any other applicable law, and due process, and constituted the best practicable notice under the circumstances; moreover, due and sufficient notices of the Fairness Hearing and rights of all members of the Settlement Class have been provided to all people, powers, and entities entitled thereto. The Settlement Class has been notified of the Settlement Agreements pursuant to the plan approved by the Court. Settlement Class members had the opportunity to be heard on all issues regarding the resolution and release of their claims by filing objections to the Settlement Agreements with the Court.

In addition, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1711 et seq., notice was provided to the Attorneys General for each of the states in which a Class Member resides and to the Attorney General of the United States.

18

Thompson Decl. ¶ 4. Accordingly, the Court finds that the appropriate state and federal officials were timely notified of the Settlement Agreements under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, and that ninety days have passed without comment or objection from any governmental entity.

**B.    Final Certification of the Settlement Class is Warranted under Rule 23.**

As an initial matter, when presented with a motion for final approval of a class action settlement, a court first evaluates whether certification of a settlement class is appropriate under Federal Rule of Civil Procedure 23(a) and (b). Class certification is proper when the proposed class meets all the requirements of Rule 23(a) and one or more subsections of Rule 23(b). Rule 23(a) requires (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. FED. R. CIV. P. 23(a)(1)-(4). Rule 23(b)(3) requires that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The Court analyzed these factors in the Preliminary Approval Order and reaffirms those findings here. For purposes of the settlement of the claims against the Settling Defendants, the Court finally certifies the following class, except for

19

those who have timely opted out: all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and July 22, 2025. The defined Settlement Class specifically excludes the Defendants, along with their officers, directors, and employees. Entities in which any Defendant holds a controlling interest, as well as any affiliates, legal representatives, heirs, or assigns of the Defendants, are also not included. This exclusion extends to any judicial officer overseeing this case, along with their immediate family members and judicial staff, and Class Counsel, including the employees of their respective law firms.

The Court finds that certification of the Settlement Class is warranted in light of the Settlement Agreements under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Class; (3) Plaintiffs' claims are typical of the claims of the members of the Settlement Class; and (4) Plaintiffs and their counsel have demonstrated that they have fairly and adequately represented the interests of the members Settlement Class and will continue to do so. The Court finds the Settlement Class satisfies the "predominance" requirement of Federal Rule of Civil Procedure

20

23(b)(3) because common issues, including whether Settling Defendants entered into a conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context. The Court finds the Settlement Class satisfies the "superiority" requirement of Federal Rule of Civil Procedure 23(b)(3) in light of, inter alia: (a) the interests of the Settlement Class members in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning these claims already commenced; (c) the desirability of concentrating the litigation of the claims in a particular forum; and (d) the impracticality or inefficiency of prosecuting or defending separate actions.

The Court reaffirms the appointment of Plaintiffs 1925 Hooper, LLC, Robert J. Arko, and Andrew M. Moore as the representatives of the Settlement Class. The Court finds that the representatives of the Settlement Class have fairly and adequately protected the interests of the Settlement Class, and will continue to do so, as: (a) the interests of the representatives of the Settlement Class are consistent with those of members of the Settlement Class; (b) there appear to be no conflicts between or among the representatives of the Settlement Class and the other members of the Settlement Class; (c) the representatives of the Settlement Class have been active participants in both the prosecution and the settlement of this

21

litigation, and will continue to do so; and (d) the representatives of the Settlement Class and members of the Settlement Class are represented by qualified, reputable counsel who are experienced in litigating large, complex consumer class action cases.

As discussed below in Section IV, in response to objections filed by parties in parallel competing cases, the Court has specifically considered that the Settlement Class is nationwide and releases claims arising from sales of homes listed on NAR and non-NAR MLSs, including all claims on behalf of those members of the Settlement Class who both bought and sold homes during the class period. This is because the home buyer claims arise from the identical factual predicate as the home seller claims. Plaintiffs in this case plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges certain NAR rules.

The Court finds that certifying a nationwide class is warranted, as: (a) a nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class; (b) a nationwide settlement will conserve judicial and private resources; and (c) members of the Settlement Class were fully apprised of the Settlement Class definition through the notice process. As the Court explains

22

more thoroughly below, the Settlement Agreements could not have been consummated absent providing for a nationwide recovery and release.

## C.    The Proposed Settlement Agreements Are Fair, Reasonable, and Adequate Under Rule 23.

The law generally encourages settlement. See Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984) ("[O]ur judgment is informed by the strong judicial policy favoring settlement as well as by the realization the compromise is the essence of settlement."); In re Equifax Inc. Customer Data Security Breach Litig., 999 F.3d 1247, 1273 (11th Cir. 2021) ("there is a strong judicial policy favoring settlement") (internal quotation omitted).  Furthermore, "settlements of class actions are highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits." Carnegie v. Mut. Sav. Life Ins. Co., No. Civ-99-S-3292-NE, 2004 WL 3715446, at *17 (N.D. Ala. Nov. 23, 2004) (quotation and citation omitted); see also 4 Newberg and Rubenstein on Class Actions § 13:44 (6th ed.) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding lengthy trials and appeals.").  However, the Court

23

does not rely on any presumption in favor of settlements here because the Court finds these Settlement Agreements are fair, reasonable, and adequate.

Courts have substantial discretion in determining whether to approve a settlement agreement. Bennett, 737 F.2d at 986. In exercising this discretion, the court should consider the "strong judicial policy favoring settlement as well as . . . the realization that compromise is the essence of settlement." Id. (citing United States v. City of Miami, 614 F.2d 1322, 1344 (5th Cir. 1980)); In re Blue Cross Blue Shield Antitrust Litig., 85 F.4th 1070, 1087 (11th Cir. 2023) ("[D]etermining the fairness of the settlement is left to the sound discretion of the trial court.").

Rule 23(e)(2) delineates criteria for determining whether to grant final approval of a proposed class action settlement as follows:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

24

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

FED. R. CIV. P. 23(e)(2).

## 1.    The Class Members Were Adequately Represented.

The Court finds that Settlement Class Representatives and Class Counsel have adequately represented the Settlement Class and will continue to do so in accordance with Rule 23(e)(2)(A).  Class Counsel and the representatives of the Settlement Class prosecuted this action on behalf of the Settlement Class with vigor and dedication, conducting themselves in the Settlement Class's best interest and adequately representing the proposed Settlement Class.  Specifically, Class Counsel:

(a) engaged in extensive pre-filing investigation beginning in the Fall of 2023;

(b) drafted and filed a detailed complaint and an amended complaint against twenty-seven (27) defendants, the majority of which do business only in Georgia;

(c) worked alongside counsel for the Missouri Gibson Plaintiffs to attempt to consolidate numerous class actions asserting similar claims (including this action) in front of the JPML;

(d) engaged in extensive settlement negotiations with the Settling Defendants, which included undertaking thorough and detailed research into the Settling Defendants' relevant financial information, reviewing publicly available market data regarding each defendant, and comparing each defendant with similarly situated brokerages; and

(e) participated in all-day mediations with two of the Settling Defendants with the assistance of highly respected mediators.

The class representatives likewise were actively engaged, and adequately represented the class, as they: do not have any interests antagonistic to other Class Members; retained lawyers with the necessary qualifications, skill, and experience to lead this litigation; approved the filing of this action and the terms of the Settlement Agreements; and have been and continue to be prepared to represent the Settlement Class throughout the settlement-approval process.

### 2.    The Proposed Settlement Was Negotiated at Arm's Length.

The settlements reached with each of the Settling Defendants were conducted at arm's length. Indeed, the parties reached settlements with eXp and Weichert only after mediations with respected mediators and only finalized the proposed terms of the Settlement Agreements after multiple rounds of additional negotiations and drafting of documents. The participation of former judges Daniel Weinstein and Randy Rich, as well as Ambassador David Carden as mediators, supports the procedural fairness of the Settlement Agreements. See Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire

26

mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion."). Further, no attorneys' fees were negotiated or agreed upon as part of the negotiations leading to the Settlement Agreements, and there were no undisclosed side agreements.

### 3.    The Relief Provided to the Class is Adequate.

In accordance with Rule 23(e)(2)(C), the Court finds that the relief provided to the Settlement Class is adequate. First, taking into account the costs, risks, and delay of any trial and any appeal, there is some uncertainty as to whether Plaintiffs could succeed on their claims, even if the Class is certified, either at the summary judgment phase or at trial. Moreover, continued litigation would likely involve additional significant attorneys' fees and expenses inherent with a final resolution potentially years later. Even if a jury awarded the Settlement Class more in damages that they will receive under the Settlement Agreements, such an outcome is far from guaranteed, and any such relief would occur, if at all, after years of protracted litigation, including appeals. The Settlement Agreements provide the members of the Settlement Class significant benefits while eliminating significant risks.

Additionally, the monetary benefit of all of the Settlement Agreements is significant. For example, the eXp settlement, which includes payment of $34

27

million as well as practice changes, compares favorably in both economic and non-economic terms to settlements reached by the <u>Gibson</u> Plaintiffs and approved in the <u>Gibson</u> Action and guarantees the Settlement Class tens of millions of dollars over the next two years, without the risk of prolonged litigation and accumulated expenses. Thus, the eXp Settlement is fair, adequate and reasonable in light of, among other things, its economic and non-economic components being on par with those reached by the <u>Gibson</u> Plaintiffs in the <u>Gibson</u> Action. <u>See</u> eXp Mot. to Join at 4-8 (providing a chart of various brokerages' annual sales compared to the Settlement Amounts paid to the plaintiffs in the <u>Gibson</u> Action demonstrating that relative to its annual sales, the settlement with eXp is in the middle of the Settlement Amounts <u>Gibson</u> Plaintiffs reached, all of which have received final approval in that case).

Similarly, the Weichert Settlement includes changes to its business practices as well as a settlement amount of $8.5 million. Amongst the settlements that various plaintiffs have reached with brokerages in parallel litigation, $8.5 million, when measured against Weichert's total business ($22 Billion), is one of the highest figures relative to annual sales of any settling defendant in related litigation. <u>See</u> Weichert's Mot. for Joinder at 4-8 (providing a chart of various brokerages' annual sales compared to the Settlement Amounts paid by those

28

brokerages in parallel litigation demonstrating that the settlement reached with Weichert's is one of the highest settlements reached in this litigation).  In all, both Settlement Agreements are within the range of reasonableness and provide a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources.

Naturally, the Parties dispute the strength of their claims and defenses.  The Settlement Agreements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes.  Plaintiffs' best-case scenario is prevailing on the merits at trial in this litigation and upholding their award on appeal.  But "experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation."  In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 523 (E.D. Mich. 2003).  The same is true for post-trial motions and appeals.  And being liable alone for the alleged damages could potentially bankrupt the Settling Defendants, rendering a significant recovery less likely even if Plaintiffs do prevail.  Against this risk, the Settlement Agreements provide for a recovery of $44,050,000 from just four of many named Defendants in this action.

The Settlement Agreements are supported by the financial condition of the Settling Defendants, which lack the ability to pay the damages alleged if Plaintiffs were entirely successful at trial. As discussed above, to evaluate the Settling Defendants' financial condition, Class Counsel reviewed substantial financial information provided by each Settling Defendant and published by eXp (which is publicly traded) to determine their ability to satisfy a judgment and have attested that the settlement amounts are reasonable in light of limitations on the Settling Defendants' ability to pay.

The fact that the Settlement Agreements include meaningful changes to the Settling Defendants' policies also supports the conclusion that the Settlement Agreements are fair, adequate, and reasonable. Those changes include Settling Defendants, and their subsidiaries and affiliates, making the following practice changes, to the extent they are not already implemented, within three months of the Settlement Effective Date:

a.  advise and at least yearly remind any Settling Defendant's agents (including, without limitation, independent contractor real estate agents) that there is no requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, nonnegotiable or unilateral;

b.  require that any Settling Defendant's agents (including, without limitation, independent contractor real estate agents) disclose to prospective home sellers and buyers and state in conspicuous language

30

that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Settling Defendants will require that any of their agents include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

c.      prohibit any Settling Defendant's agents (including, without limitation, independent contractor real estate agents) acting as cooperating broker, buyer broker, or other buyer representative from advertising or otherwise representing that their services are free unless they will receive no financial compensation from any source for those services;

d.      require that Settling Defendant-owned brokerages and their agents disclose any offer of compensation made in connection with each home marketed to prospective buyers in any format. For purposes of clarity, a seller's offer or "seller's concession" within the MLS fields that are not limited to or conditioned on it being used to compensate a cooperating broker, buyer broker or other buyer representative, but may be used as such, is not an "offer of compensation" for purposes of this subparagraph;

e.      prohibit any Settling Defendant's agents (including, without limitation, independent contractor real estate agents) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, buyer broker or other buyer representative unless directed to do so by the client (and eliminate any internal Settling Defendant systems or technological processes that may currently facilitate such practices);

31

f.    advise and at least yearly remind any Settling Defendant company-owned brokerages and their agents of their obligation to show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives, provided that each such property meets the buyer's articulated purchasing priorities;

g.    for each of the above points, for any Settling Defendant company-owned brokerages franchisees, and their agents, develop training materials consistent with the above relief and eliminate or modify any contrary training materials currently used.

Higher Tech Settlement Agreement ¶¶ 51-52; eXp Settlement Agreement ¶¶ 49-50; Weichert Settlement Agreement ¶¶ 47-48; Atlanta Communities Settlement Agreement ¶¶ 50-52.

### 4.    Class Members Are Treated Equally Relative to Each Other.

In accordance with Rule 23(e)(2)(D), the Settlement Agreements treat members of the Settlement Class fairly and equitably relative to each other. Under the plain language of the Settlement Agreements, no member of the Settlement Class is treated differently from any other member. The practice change relief applies equally to all members of the Settlement Class and, as for monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. Further, Plaintiffs' counsel has submitted a Plan of Allocation [Doc. 232-1] to the Court that ensures an equitable, pro rata distribution of funds amongst the Settlement Class based on the amount of commissions paid

32

by each member of the Settlement Class. Once the Plan of Allocation has been approved by the Court, additional notice and an opportunity to lodge objections will be provided to the members of the Settlement Class.

The Court-appointed notice and claims administrator, CPT, will work with Class Counsel in processing Settlement Class member claims and distributing relief. CPT has experience in distributing relief in connection with large and complex class action settlements. CPT will be responsible for reviewing claim forms and evidence of purchase to determine whether a claim is an approved claim, and any claim that cannot be confirmed may be subject to challenge, nonpayment, or a reduced share of the available funds. Settlement Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. Further, as discussed below, the attorneys' fee request is reasonable and in line with Eleventh Circuit precedent.

The Court is satisfied that the Settlement Agreement meets the requirements of Rule 23(e)(2) and finds that the terms of the Settlement Agreements are fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23.

33

### D.    The Proposed Settlement is Fair, Adequate and Reasonable Under the <u>Bennett</u> Factors.

"[I]n order to approve a settlement, the district court must find that it 'is fair, adequate, and reasonable and is not the product of collusion between the parties.'" <u>Bennett</u>, 737 F.2d at 986 (quoting <u>Cotton v. Hinton</u>, 559 F.2d 1326, 1330 (5th Cir. 1977)). In addition to the Rule 23 factors, the United States Court of Appeals for the Eleventh Circuit has directed district courts to consider the following factors in determining whether to approve a class settlement:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

<u>Id.</u>

Courts have substantial discretion in determining whether to approve a settlement agreement. <u>Id.</u> In exercising this discretion, the court should consider the "strong judicial policy favoring settlement as well as . . . the realization that compromise is the essence of settlement." <u>Id.</u> (citing <u>United States v. City of Miami</u>, 614 F.2d 1322, 1344 (5th Cir. 1980)). As stated below, in consideration of all the <u>Bennett</u> factors, this Court finds that the proposed Settlement Agreement provides the best practical means of providing relief to the Class.

34

### 1.    Likelihood of Success at Trial and Complexity, Expense, and Duration of the Litigation

The Court considers the first and fourth Bennett factors together. The Court finds that there were substantial hurdles that Plaintiffs faced in succeeding on the merits of their claims. Defendants have disputed liability under any of the causes of action asserted by Plaintiffs. It is entirely possible that Plaintiffs would not prevail in establishing Defendants' liability on the merits, either on summary judgment or after a trial. The questionable likelihood of success also affects the possible range of recovery because, even if Plaintiffs prevailed on liability with respect to one or more claims, they would not be assured of a recovery to the full extent of claimed damages. This case was complex, expensive, and time-consuming which, when combined with the uncertainty of recovery, meant that the range of possible recovery included amounts far less than those agreed to in the Settlement Agreement. Class Counsel invested nearly 1,500 hours of attorney time to litigate this case and made significant investments in expenses.

In order to proceed to trial, the parties would have to devote significant time to expert discovery after the class certification stage (assuming the Court certified a class), would file motions for summary judgment and to exclude expert testimony and then, if Plaintiffs' claims survived, the resulting trial would require months of preparation. In addition, even assuming that Plaintiffs succeeded in

35

establishing liability and recovered all damages sought, which is highly unlikely, the case would likely undergo a protracted appellate process with an affirmance of the district court's decision far from certain.

### 2.   Range of Possible Recovery and the Point at Which the Settlement is Fair, Adequate, and Reasonable

The Court considers the second and third Bennett factors together. See Cifuentes v. Regions Bank, No. 11-CV-23455 FAM, 2014 WL 1153772, at *5 (S.D. Fla. Mar. 20, 2014) ("The second and third factors [i.e., the range of possible recovery and the range of possible recovery at which a settlement is fair, adequate, and reasonable] are easily combined and normally considered in concert."). "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality." Lipuma v. Am. Express Co., 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).

In this case, the range of possible recovery spans from a finding of non-liability through to total victory with potential significant monetary benefits to class members, in addition to varying levels of injunctive relief. Because there is such a broad range of recovery, the fact that the Settlement Amounts may be for less than some Settlement Class members might hope to recover at trial does not present an obstacle to approval of the Settlement Agreements. See In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) ("That the

proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair."). Indeed, courts regularly find settlements to be fair even where "[p]laintiffs have not received the optimal relief." Warren v. City of Tampa, 693 F. Supp. 1051, 1059 (M.D. Fla. 1988).

The Settlement Agreements include significant monetary awards totaling over $44 Million coupled with meaningful injunctive relief changing the Settling Defendants' business practices. As a percentage of the Settling Defendants' sales volume, the monetary awards are more significant than many of the awards that were approved in Gibson. See Jan. 7 Knight Decl. ¶¶ 14 -26 (examining "total sales' transaction volumes" and explaining how the settlements at issue in this case are all "within the range of the settlements that have been approved in the Gibson Action with similarly situated brokerages."). For example, the settlement amount reached in the Weichert Settlement ($8.5 Million) is more than most of the settlements reached against other brokerages in parallel litigation. See Weichert's Mot. for Joinder at 4-8. Similarly, the settlements reached with eXp, Higher Tech, and Atlanta Communities, relative to their annual sales, were all in the middle of the range of settlements reached against other brokerages in parallel litigation. Id.; see also eXp Mot. to Join at 4-8 (providing a chart of settlements reached in the Gibson Action compared to the annual sales of the brokerages). In antitrust cases

37

such as this one, courts frequently examine a company's relative sales volume as a metric in assessing antitrust damages. See In re Packaged Ice Antitrust Litig., 322 F.R.D. 276, 294 (E.D. Mich. 2017) (finding that settlement amount representing a percentage of the settling defendant's sales was "fair and reasonable."); In re Pressure Sensitive Labelstock Antitrust Litig., 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) (finding that settlement, which was a percentage of the defendant's sales, was "within the range of settlements approved in other class action cases" and was "well within the range of reasonableness."); In re NASDAQ Mkt.-Makers Antitrust Litig., 187 F.R.D. 465, 472 (S.D.N.Y. 1998) (granting final approval of class action settlements in antitrust case, using the settling defendant's market share as a metric in assessing the range of reasonableness). Indeed, in the NAR settlement reached in the Burnett Action, the parties used the same transaction or sales volume data as a measuring stick for evaluating whether non-defendant brokerages could participate in that settlement. See NAR Settlement, App. C, Burnett Action ECF NO. 1458-1 ¶ 22 (allowing a brokerage to option to the NAR Settlement if it pays a percentage of its annual sales into the settlement fund).

The substantial Settlement Amounts coupled with the meaningful injunctive relief changing the Settling Defendants' business practices in this case fall squarely within the range of reasonableness.

38

### 3.    The Substance and Amount of Opposition to the Settlement

The amount of opposition to the Settlement Agreement is small. Specifically, more than 750,000 individuals have submitted claims, while only two objections (encompassing four total objectors) have been filed, and only twelve individuals requested exclusion from the class. Such minimal opposition to the Settlement Agreements supports granting final approval. See In re Equifax Inc. Customer Data Sec. Breach Litig., No. 1:17-md-2800-TWT, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) (holding that "miniscule number of objectors in comparison to the class size is entitled to significant weight in the final approval analysis."); see also In re Home Depot, Inc., Customer Data Sec. Breach Litig., No. 1:14-md-2583-TWT, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (finding that where there were only five timely objections out of tens of millions of Class Members supports approval: "the number of objectors amount to an infinitesimal percentage of the Settlement Class. This miniscule number indicates strong support for the Settlement by Settlement Class Members and weighs strongly in favor of final approval."). While the number of objectors is "not controlling," Cotton, 559 F.2d at 1331, a relatively small number of objectors can be taken as "some indication that the class members as a group did not think the settlement

was unfair." <u>Kincade v. Gen. Tire & Rubber Co.</u>, 635 F.2d 501, 506 n. 4 (5th Cir. 1981).[9]

As will be discussed in this Order in Section IV, the Court has carefully considered the contentions of the individuals who filed objections to the Settlement Agreements and has determined that none of the objections are sufficient to overcome the fairness of the Settlement Agreement.

### 4. The Stage of the Proceedings at Which Settlement was Achieved

The stage of the proceedings also weighs in favor of the Settlement Agreement. The time from the filing of the initial Complaint until the settlement was reached with eXp and Weichert was eleven months. The Court is satisfied that Plaintiffs were able to evaluate the desirability of the settlement as opposed to continuing with the litigation.

### 5. Judgment of Class Counsel

In addition, "[i]n a case where experienced counsel represent the class, the Court 'absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel.'" <u>Ingram</u>, 200 F.R.D. at 691 (quoting <u>Cotton</u>, 559

---

[9] <u>See</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981).

F.2d at 1330). In light of Class Counsel's qualifications, which include substantial experience litigating class actions and other complex cases, the Court "has confidence in their collective judgment that the benefits of this settlement far outweigh the delay and considerable risk of proceeding to trial." Id.

All of the Bennett factors weigh in favor of granting final approval.

## IV.    OBJECTIONS TO THE SETTLEMENT AGREEMENT

The Court has carefully considered each of the timely filed objections. All objections are overruled as none of the objections provides a basis for denying final approval of the Settlement Agreements. See Ponzio v. Pinon, 87 F.4th 487, 499 (11th Cir. 2023) (recognizing that while "the proponents of a class action settlement bear the burden of developing a record demonstrating that the settlement is fair, reasonable, and adequate, objectors to the settlement have some obligations of their own") (internal citation omitted); Carr v. Ocwen Loan Servicing, LLC, No. 1:13-CV-00732-JCF, 2014 WL 12860083, at *4 (N.D. Ga. Apr. 25, 2014) ("[O]nce preliminary approval has been granted to a settlement, the settlement 'is presumptively reasonable, and an objector must overcome a heavy burden to prove the settlement is unreasonable.'") (quoting Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 467 (S.D. Fla. 2002)).

41

## A.     The Gibson Plaintiffs' Objections

Three objectors, Don Gibson, Jeremy Keel, and Daniel Umpa—all of whom are plaintiffs in the parallel Gibson Action against, among others, Settling Defendants Weichert and eXp—lodged objections challenging solely the settlements with eXp and Weichert on the grounds that: (a) the Settlement Agreements were the result of a "blind reverse auction;" and (b) counsel representing the Settlement Class is inadequate because they failed to take substantial action to litigate this case, including the failure to conduct significant discovery, prior to negotiating the Settlement Agreements. Gibson Objs. at 21-48. The Gibson Action, pending in the Western District of Missouri, alleges claims against Weichert and eXp that are virtually identical to those at issue in the present case. The Gibson plaintiffs unsuccessfully attempted to settle these virtually identical claims with eXp and Weichert prior to commencing discovery in the Gibson Action, although they were able to reach pre-discovery settlements with multiple other defendants in the Gibson Action. Counsel for the Gibson Plaintiffs previously litigated another class action in Missouri (the Burnett Action) asserting similar claims as those at issue in the present case and also represented the four

42

plaintiffs from the Gibson Action who moved to intervene in this case, two of whom are also objectors.

With respect to their "blind reverse auction" allegations, the Gibson Plaintiffs argue the Weichert settlement is inadequate because—while Weichert settled for $8.5 million here—Weichert previously offered the Gibson Plaintiffs $13 million to globally settle the claims against it. With respect to eXp, the Gibson Plaintiffs' argument is based on their assertion that—while eXp settled for $34 million in this case—a mediator told the Gibson Plaintiffs' counsel during a mediation in that case that he thought eXp might pay approximately $40 million to globally settle the claims against it.

This Court finds that the Gibson Plaintiffs' reverse auction argument lacks merit. First, the Court's research reveals only one reported federal case in which the phrase "blind reverse auction" even appears, and that case involved two companies responding to a government agency's request for proposals, and the agency then conducted a "blind reverse auction" between the two offerors to determine the low bid. Xerox Corp. v. United States, No. 21-1807, 2021 WL 9563553, at *2 (Fed. Cl. Dec. 17, 2021). At the Fairness Hearing, counsel for the Gibson Plaintiffs conceded there are no other cases discussing the concept of a

43

blind reverse auction, and certainly none which applied to the facts of this case. Tr. of Fairness Hr'g (Oct. 28, 2025) ("Tr.") [Doc. 243] at 43-45.

Second, the evidence in this case does not establish that either Settlement Agreement with Weichert or eXp was the result of a reverse auction. A reverse auction is said to occur when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with . . . the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." Reynolds v. Beneficial Nat'l Bank, 288 F3d 277, 282 (7th Cir. 2002). Such a scenario raises the question of whether a class settlement is the product of collusion. But in this case, no evidence has been offered to show that Weichert or eXp ever revealed to Class Counsel the substance of its settlement discussions with the Gibson Plaintiffs. The position of objectors' counsel appears to be that when a defendant offers a certain amount to settle a case and has the offer rejected by a group of plaintiffs, a later agreement to enter into a settlement for a lesser amount with another group of plaintiffs constitutes some kind of reverse auction, even when the record reflects that the defendant did not reveal the content of the prior settlement discussion with the later plaintiff. Such an argument has no support in case law. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1189 (10th Cir. 2002) (stating that, if the objector's argument

44

was accepted, the "reverse auction argument would lead to the conclusion that that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a collusive reverse auction.") (internal quotation marks omitted).

Indeed, despite repeated requests, the Gibson Plaintiffs have failed to direct the Court to any authority where a Court found that a reverse auction had occurred and denied final approval of a settlement under circumstances similar to those here. Tr. of Fairness Hr'g (Oct. 28, 2025) [Doc. 243] at 43-52. As set forth above, the Settlement Agreements with Weichert and eXp were the result of arms-length bargaining, counsel for the Settlement Class's review and analysis of substantial financial and other information concerning Defendants, and Defendants' alleged conduct and their financial resources to reasonably pay a judgment, as well as mediations with three highly reputable mediators.

The Gibson Plaintiffs also argue that Class Counsel is inadequate because they failed to conduct significant discovery in this case prior to negotiating the Settlement Agreements, including discovery into the financial condition of eXp and Weichert. The Gibson Plaintiffs' position appears to be that the settlement figures they hoped to get during their counsel's unsuccessful negotiations and

45

mediations with eXp and Weichert represent the only possible fair, reasonable and adequate resolution. That is not the law. Rather, even if the Court were to credit the Gibson Plaintiffs' view that the claims in the present case should have been valued differently, approval is still appropriate if the court finds "that the relief afforded under the settlement agreement was adequate." Ponzio, 87 F.4th at 505; see also Lunsford v. Woodforest Nat'l Bank, No. 1:12-CV-103-CAP, 2014 WL 12740375, at *6 (N.D. Ga. May 19, 2014) (holding that as a part of determining whether a class settlement is fair, adequate and reasonable under Rule 23 "the Court is not called upon to determine whether the settlement reached by the parties is the best possible deal.") (internal quotation and citation omitted). Here, the Court finds that the relief afforded by the Settlement Agreements is fair, reasonable and adequate, for the reasons set forth above.

Moreover, with respect to the eXp settlement, counsel for the Settlement Class are requesting 20% of the Settlement common fund in attorneys' fees, while the Gibson Plaintiffs would have requested 33.3%. This difference will net the Settlement Class in this case far more (around $500,000.00) than the Settlement Class would have received if the Gibson Plaintiffs had been willing to settle (which they were not), and if they could have settled (which is unknown), with eXp for $40 million. As such, the Gibson Plaintiffs' objections ring hollow.

46

Similarly unavailing are the Gibson Plaintiffs' arguments regarding the performance of Class Counsel in this case. First, the Gibson Plaintiffs' assertion that Class Counsel failed to consider eXp's or Weichert's "ability to pay" is not only unsupported by any evidence, it is contrary to the record evidence showing that:

> (a) Plaintiffs here entered into confidentiality agreements with all Settling Defendants pursuant to which these defendants provided Class Counsel with financial statements, tax returns, financial reports, sales volumes, commission totals, listings, engagement agreements and/or other information to facilitate Class Counsel's analysis of the potential range of a fair and reasonable settlement;

> (b) Class Counsel spent many hours reviewing eXp's SEC filings, including the most recent 10-K (annual report) and 10-Q (quarterly report), which provided cash on hand, cash equivalents, debt and other information Class Counsel considered in their analysis of a reasonable and fair settlement range;

> (c) Class Counsel also researched these issues through other independent sources, such as Market Watch, T360 real estate reports, and Real Trends real estate reports; and

> (d) Class Counsel also met with Weichert's Chief Financial Officer and Corporate Counsel to review Weichert's confidential financial information and obtain answers to Class Counsel's questions arising from their review of information Weichert provided, including information regarding Weichert's cash on hand and cash equivalents, debt, and other information relevant to Weichert's ability to pay.

The Gibson Plaintiffs' assertion that Class Counsel rushed to settle these cases without adequate discovery also lacks merit for multiple reasons. Indeed,

47

even though this case was stayed for the majority of its existence (thus preventing formal discovery), the Court expressly authorized and contemplated that the Parties would engage in settlement negotiations, mediations, and informal discovery to facilitate and consummate settlements while the case was stayed. May 20, 2024, Order at 3. The record reveals that both eXp and Weichert voluntarily provided Plaintiffs and counsel for the Settlement Class with financial documents, including the information needed to assess eXp's and Weichert's ability to pay and arrive at fair, adequate, and reasonable Settlement Amounts, thereby obviating the need to take discovery to uncover such information.

Finally, the Gibson Plaintiffs' objection regarding the lack of formal discovery rings hollow given that they too attempted to settle with Weichert and eXp before conducting any discovery in the Gibson Action. Thus, the Gibson Plaintiffs' own conduct shows that these cases have been in a settlement posture from their initial filing dates because of, among other things, the favorable verdict in the Burnett Action and the potential impact on liability and the substantial discovery regarding industry practices reportedly taken in that case. The Gibson Plaintiffs cannot dispute this given their pre-discovery settlements with multiple defendants in the Gibson Action.

48

Accordingly, the objections of Don Gibson, Jeremy Keel, and Daniel Umpa are **OVERRULED**.

## B.    The Mullis Objection

The fourth objector, James Mullis, seeks to carve out indirect purchaser buyer claims from the releases in the Settlement Agreements.  Mullis contends that "[i]f the Court approves the releases as currently drafted, settling Defendants might later claim that the releases apply to putative class claims that have been heavily litigated by Mullis and others to recover damages suffered when buying homes listed on an MLS in which a brokerage commission was paid, whether because Defendants' conduct caused higher home prices or otherwise.  Mullis Obj. at 2 (citing Batton v. Nat'l Ass'n of Realtors, et al., 21-cv-430 (N.D. Ill.) ("Batton Action") and Davis v. Hanna Holdings, Inc., 24-cv-02374 (E.D. Pa.) ("Davis Action")).  However, every member of the Settlement Class sold a home during the class period, and most also bought homes.  After all, few people sell a home without first buying it.  And most home sellers then buy a different home with the proceeds because they need somewhere to live.  Thus, most members of the Settlement Class had possible claims both as home sellers and home buyers.  Yet the Settling Defendants quite reasonably would have balked at paying large

49

amounts in settlement with a seller class only to have the same people they just paid sue them again as buyers for the same alleged antitrust conspiracy.

Plaintiffs and Settling Defendants solved this problem by crafting the releases to incorporate the Eleventh Circuit's "identical factual predicate" standard, and to otherwise comply with federal law. As explained by the United States Supreme Court, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 377 (1996) (citation and internal quotation marks omitted). Under the identical factual predicate doctrine, "a settlement agreement may release claims that share a common nucleus of operative fact with the claims in the underlying litigation." In re Blue Cross Blue Shield Antitrust Litig., 85 F.4th at 1090. "In practice, the doctrine mirrors res judicata: a release may lawfully bar later actions arising from the same cause as the settled litigation." Id. (citing TVPX ARS, Inc. v. Genworth Life & Annuity Ins., 959 F.3d 1318, 1325 (11th Cir. 2020)). Indeed, the Eleventh Circuit has recognized "that res judicata applies not only to the precise legal theory presented in the previous litigation but to all legal theories and claims arising out of a common nucleus of fact." Id. (citing Trustmark Ins. v. ESLU, Inc., 299 F.3d 1265, 1270 n.3 (11th Cir. 2002)).

Here, the home purchaser claims advanced in the <u>Batton</u> and <u>Davis</u> Actions arise under the same alleged anticompetitive conduct—principally, the NAR's so-called Mandatory Offer of Compensation Rule—and the same theory and factual predicate at issue in this case. Each Settlement Agreement incorporates the appropriate standard by including the following release language:

> Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money or for injunctive, declaratory, or for other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, actual or contingent, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall or may have and that have accrued as of the date of final approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Action and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of final approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of any doubt, this release extends to, but only to, the fullest extent permitted by law.

Higher Tech Settlement Agreement ¶ 29; eXp Settlement Agreement ¶ 26; Weichert Settlement Agreement ¶ 26; Atlanta Communities Settlement Agreement

51

¶ 28. The Settlement Agreements define "Released Claims" as "any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Action based on any or all of the same factual predicates for the claims alleged in the Action, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." Higher Tech Settlement Agreement ¶ 18; eXp Settlement Agreement ¶ 11; Weichert Settlement Agreement ¶ 10; Atlanta Communities Settlement Agreement ¶ 17.

The Parties validly restricted the releases' scope. The Settlement Class members would have been bound by res judicata if the case had proceeded to final judgment, and the releases impose no greater preclusive effect from settlement. Every Settlement Class member was free to weigh their competing claims and make a choice. They could have opted out and would be free to pursue buyer claims. And people with buyer-only claims are completely unaffected because they are not part of the class.

Mullis argues that the settlements release indirect purchaser buyer claims "for no additional consideration." Having properly limited the scope of the releases based on the "identical factual predicate" standard, however, the Court

52

finds the parties were under no further obligation to assign separate settlement values to every distinct claim that Settlement Class members might have asserted. Mullis also takes issue with the alleged inequitable treatment of some theoretical Settlement Class members who separately purchased homes. However, as the Court has already recognized, the entire Settlement Class, including Mullis, receives significant benefits under the Settlement Agreements for claimed damages sustained listing and selling homes on an MLS. Moreover, the entire Settlement Class, again including Mullis, benefits from injunctive relief in the form of practice changes imposed upon the Settling Defendants, many of which expressly concern the conduct of buyer brokers. To the extent certain Settlement Class members who also separately purchased homes are releasing claims framed as "home purchaser claims," they are not treated inequitably under controlling precedent. In compliance with prevailing federal law and within the requirements established by the Eleventh Circuit, Plaintiffs properly limited the scope of the Releases to the "identical factual predicate" and are under no further obligation to assign separate settlement values to every distinct claim that class members might have asserted.

Accordingly, the Mullis Objection is **OVERRULED.**

## V.    ATTORNEYS' FEES AND EXPENSES OF LITIGATION

The Court finds that Class Counsel has adequately represented the Class, that the parties' agreement with regard to the payment of fees was not negotiated while they were negotiating the other terms of the Settlement Agreements, and that the Settlement Agreements with regard to the payment of fees and expenses was not the product of collusion or fraud.  For the reasons discussed below, Class Counsel's application for an award of attorneys' fees and reimbursement of costs as set forth in the Plaintiffs' Motion for Award of Attorneys' Fees and Expenses is hereby approved and fees and reimbursements shall be paid in accordance with that Motion.

Class Counsel is seeking an award of litigation expenses in the amount of $29,312.62, and attorneys' fees of $8,810,000, which amounts to 20% of the common fund established by the Settlement Agreements.  Pls.' Mot. for Award of Att'y's Fees and Expenses at 6.  No opposition or objection to Plaintiffs' Motion has been filed with the Court.

### A.    Calculation of Attorneys' Fees

The requested attorneys' fee award of $8,810,000 as a percentage of the common fund established by the Settlement Agreements is justified under the approach adopted by the Eleventh Circuit in <u>Camden I Condo. Ass'n, Inc. v.</u>

Dunkle, 946 F.2d 768 (11th Cir. 1991).  See also Lunsford, 2014 WL 12740375, at

*11 (citing Camden I, 946 F.2d at 771) ("It is well established that when a

representative party has conferred a substantial benefit upon a class, counsel is

entitled to attorneys' fees based upon the benefit obtained.").

In Boeing Co. v. Van Gemert, 444 U.S. 472 (1980), the Supreme Court

affirmed a ruling that absentee class members had received a benefit within the

meaning of the common-fund doctrine and addressed "whether a proportionate

share of the fees awarded to lawyers who represented the successful class may be

assessed against the unclaimed portion of the fund created by a judgment." Id. at

473.  The Court held the attorneys were entitled to a reasonable fee from the whole

fund, regardless of claims rate:

> The members of the Class, whether or not they assert their rights, are at
> least the equitable owners of their respective shares in the recovery [and
> whether they claim the money or not cannot] defeat each class
> member's equitable obligation to share the expenses of litigation.

Id. at 481-82 (1980).  Put another way: "under the 'common fund doctrine,' . . . a

reasonable fee is based on a percentage of the fund bestowed on the class[.]" Blum

v. Stenson, 465 U.S. 886, 900 n.16 (1984).  Following the Supreme Court's

decision in Blum, the Eleventh Circuit expressly held that "in this circuit,

attorneys' fees awarded from a common fund shall be based upon a reasonable

percentage of the fund established for the benefit of the class." Camden I, 946

55

F.2d at 774.  In recent years, the Eleventh Circuit reaffirmed its holding in Camden

I that the percentage method is the appropriate analysis in common fund

settlements such as this one and the district court is not required to perform a

lodestar analysis.  In re Equifax Inc., 999 F.3d at 1278-81.

This Court is required to "articulate specific reasons for selecting the

percentage upon which the attorneys' fee award is based," and, in so doing,

"should identify all factors upon which it relied and explain how each factor

affected its selection of the percentage of the fund awarded as fees."  Camden I,

946 F.2d at 775.  The factors the Court should consider are:

> (1) the time and labor required; (2) the novelty and difficulty of the
> questions involved; (3) the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment by the attorney due to
> acceptance of the case; (5) the customary fee; (6) whether the fee is
> fixed or contingent; (7) time limitations imposed by the client or the
> circumstances; (8) the amount involved and the results obtained; (9) the
> experience, reputation, and ability of the attorneys; (10) the
> "undesirability" of the case; (11) the nature and the length of the
> professional relationship with the client; and (12) awards in similar
> cases.

Id. at 772 n.3 (quoting Johnson v. Ga. Highway Exp., Inc., 488 F.2d 714, 717-19

(5th Cir. 1974)).  The Court has considered all of the Camden I factors and for the

following reasons finds that these factors all support the requested fee.

Class Counsel litigated this case aggressively and comprehensively,

pursuing this action on a purely contingent fee basis at a significant risk.  In

56

pursuing this action, Class Counsel performed substantial legal work that drove the successful settlement of this case, including: research into Settling Defendants and the other previously named Defendants in the case, legal strategizing, complaint drafting, reviewing and analyzing financial and other records from the Settling Defendants, supporting the Gibson Plaintiffs' efforts to consolidate this and similar cases in an MDL, preparing for and participating in mediation, engaging in significant motion practice with respect to the Gibson Plaintiffs' attempt to intervene in this case, other motion practice that resulted in the Preliminary Approval of the Settlements and certification of the Class, overseeing the notice campaign, responding to objections, and otherwise securing the substantial benefits of the Settlement Agreements for the Class.

This was a complex antitrust case that involved substantial research and legal strategy to navigate successfully. As detailed above, to identify the appropriate defendants in the case and then to arrive at reasonable Settlement Amounts for each of the four Settling Defendants, Class Counsel engaged in significant pre- and post-filing research and review of voluminous financials and other documents. Because antitrust claims are especially complex, expensive, and difficult to prosecute, courts have recognized that a fee as high as one-third of the fund is often appropriate. See, e.g., Columbus Drywall & Insulation, Inc. v. Masco

57

Corp., No. 1:04-CV-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (approving fee of one-third of the common fund and noting that "as this Court has observed, antitrust class actions are especially complex and difficult"); In re Motorsports Merchandise Antitrust Litig.,112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000) ("An antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.").

Class Counsel have substantial experience in litigating class actions, mass torts and other complex litigation. See Jan. 7 Knight Decl. ¶¶ 2-4 (detailing credentials and prior class-action experience of Class Counsel); Decl. of Nathan D. Chapman (Jan. 7, 2025) [Doc. 136-9] ¶¶ 2-5 (same); Decl. of Jonathan D. Palmer (Jan. 7, 2025) [Doc. 136-10] ¶¶ 2-9 (same). Given the complexity of the factual and legal issues involved in this matter, Class Counsel's competence and experience in class actions clearly was a significant factor in obtaining the Settlement Agreements and the ultimate results achieved for the benefit of the Settlement Class.

Class Counsel's excellent performance in this action is further demonstrated by the fact that the Settling Defendants are represented by capable counsel from no fewer than eight different law firms, including large national firms like Alston &

58

Bird, LLP, Armstrong Teasdale LLP, Saul Ewing LLP, Vinson & Elkins, and Womble Bond Dickinson (US) LLP, as well as strong local firms like Berman Fink Van Horn, P.C., and Weissman Law. The firms representing Settling Defendants are highly competent and professional adversaries, many of whom have enormous resources at their disposal that outstrip those available to Class Counsel. See, e.g., Ressler v. Jacobson, 149 F.R.D. 651, 654 (M.D. Fla. 1992) ("[I]n assessing quality, the Court has considered the quality of the opposition as well as the standing of plaintiff's counsel."); Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1202 (S.D. Fla. 2006) ("the Eleventh Circuit recognized that 'other pertinent factors are . . . whether there are any substantial objections by class members or other parties to the settlement terms or the fees required by counsel.'") (quoting Camden I, 946 F.2d at 775). Moreover, Class Counsel have been required to respond to and defend against collateral attacks on their settlement efforts by the Gibson Plaintiffs, who: (1) attempted to intervene in this action for the purpose of having it transferred to the Western District of Missouri and consolidated with the Gibson Action; and (2) vigorously opposed approval of the eXp and Weichert Settlement Agreements.

Additionally, Class Counsel was restricted from other employment given the amount of time they committed to this action, particularly given the fact that Class

59

Counsel are comprised of two firms with just over 30 attorneys between them.  See Allapattah, 454 F. Supp. 2d at 1209 ("This factor requires the dual consideration of otherwise available business which is foreclosed because of conflicts of interest arising from the representation, and the fact that once the employment is undertaken, the attorney is not free to use the time spent on the case for other purposes.").

"The customary fee in class actions is a contingency fee, because it is not practical to find any individual that will pay attorneys on an hourly basis to prosecute the claims of numerous strangers and take on the significant additional expenses of fighting with the defendants over class certification."  Columbus Drywall, 2012 WL 12540344, at *4; Ressler, 149 F.R.D. at 654.  Here, Class Counsel requests a fee of 20% of the Settlement Amounts.  This percentage falls at the low end of the benchmark range under Camden I and its progeny.  The fee at issue (20% of fund) is exceedingly reasonable, as other courts have approved similar or even greater fees under similar circumstances.

As of the time of Plaintiffs' Motion for Award of Attorneys' Fees and Expenses, Class Counsel had spent 1,496.1 attorney hours and 59 non-attorney hours prosecuting this case.  As discussed above, Class Counsel's efforts resulted in not only significant financial relief for the class ($44.05 million) but also the

requirement that Settling Defendants adopt and implement certain practice changes that will benefit the Class members and countless other future home sellers. As courts in this Circuit have recognized, any "non-monetary benefits conferred upon the class by the settlement," are properly considered in determining the appropriate percentage of the fund to award as attorneys' fees. Allapattah, 454 F. Supp. 2d at 1202 (quoting Camden I, 946 F.2d at 775). In short, Class Counsel achieved an impressive result.

Class Counsel had to commit an unknown, but substantial, number of hours and monetary expenses to a case where the outcome was entirely uncertain. See Pinto v. Princess Cruise Lines, Ltd., 513 F. Supp. 2d 1334, 1340 (S.D. Fla. 2007) ("The relevant risks must be evaluated from the standpoint of Plaintiffs' counsel as of the time they commenced the suit and not retroactively with the benefit of hindsight."). Here, Class Counsel undertook significant risk in taking this case on contingency and agreeing to commit substantial time and effort to a case whose outcome was anything but certain. Additionally, the outcomes of prior similar actions were no guarantee that (a) the Settling Defendants would be willing to settle their claims rather than aggressively litigate this case through trial, or (b) that any eventual trial would have resulted in a favorable result for Plaintiffs. See Cardizem, 218 F.R.D. at 523.

61

As explained above, an award of 33.33% (i.e., one-third) of the common fund is common, particularly in complex antitrust actions. Indeed, counsel for the Gibson Plaintiffs have regularly requested and been granted fees totaling 33.33% of the common fund in the settlements they have reached. These fee awards demonstrate Class Counsel's petition for a fee of 20% of the fund is not only at the lowest end of this Circuit's "benchmark," it is also quite reasonable given the fees awarded in similar cases.

## B.    Expenses of Litigation

Under Rule 23(h) of the Federal Rules of Civil Procedure, a trial court may award nontaxable costs that are authorized by law or the parties' agreement. FED. R. CIV. P. 23(h). Class Counsel have submitted evidence in support of their request for reimbursement of $29,312.62. Decl. of Nathan D. Chapman (July 7, 2025) [Doc. 188-1] ¶ 13; Decl. of Bryan M. Knight (Jan. 7, 2025) [Doc. 188-2] ¶ 22. The Court finds that these expenses are reasonable and necessarily incurred on behalf of the Class. The Settlement Administrator shall be paid in accordance with the Settlement Agreements.

The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing

62

jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs. Class Counsel is, in accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

## VI.    EXCLUSIONS AND RELEASES

The twelve individuals identified in the Supplemental Thompson Declaration have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class and are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlement Agreements, whether monetary or otherwise. Nothing in this order should be construed as a determination by this Court that the excluded individuals and entities are members of the Settlement Class or that they meet other prerequisites, such as standing, for bringing claims alleged in this case. Each Settlement Class member who is not listed in Exhibit I to the Supplemental Thompson Declaration is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against Released Parties as those terms are defined in the Settlement Agreements. The Court specifically approves these releases as set forth in the Settlement Agreements.

Members of the Settlement Class, unless they excluded themselves from the Settlement Class, are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties, which include Settling Defendants' franchisees and affiliated brokerages, and agents affiliated with those franchisees or affiliated brokerages.  See 28 U.S.C. § 1651.  Released Claims include claims that arise from or relate to conduct that was alleged or could have been alleged in the actions based on any or all of the same factual predicates for the claims alleged in the actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.  For the avoidance of doubt, this injunction extends to claims arising from or relating to transactions where Settlement Class members either sold or purchased a home on any multiple listing service nationwide, regardless of affiliation or association with NAR.  This injunction does not extend to any individual claims that a plaintiff or Settlement Class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the actions.

This Order does not settle or compromise any claims by Settlement Class Representatives or the Settlement Class against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

## VII.  PLAN OF ALLOCATION

As noted above in Section III(C)(4), Plaintiffs' counsel submitted a Plan of Allocation along with a Motion to Preliminarily Approve the Plan of Allocation. No opposition or objection to Plaintiffs' Motion to Preliminarily Approve the Plan of Allocation has been filed with the Court.

The Court has considered the Motion to Preliminarily Approve the Plan of Allocation and has determined the proposed Plan of Allocation [Doc. 232-1] should be preliminarily approved so that the claimants who have filed claims in this case can get notice of the Plan of Allocation "advising them of the Plan of Allocation and of their right to object thereto." Carpenters Health & Welfare Fund v. Coca-Cola Co., 587 F. Supp. 2d 1266, 1275 (N.D. Ga. 2008).  This additional layer of protection to the Settlement Class bolsters the Court's finding that the Settlement Agreements treat Settlement Class members equitably.

## VIII.  CONCLUSION

For the reasons set forth above, it is hereby **ORDERED** as follows:

65

(1)     The Court **CERTIFIES** the Settlement Class pursuant to Federal Rules of Civil Procedure 23(b)(3) and (e).

(2)     The Court **CONFIRMS** the appointment of the law firms of Knight Palmer LLC and Kabat Chapman & Ozmer LLP as Class Counsel for the Settlement Class, and the appointment of the Settlement Class Representatives named in the Settlement Agreements.

(3)     The Court finds the class notice satisfied the requirements of Rule 23, due process, and all other legal requirements, and the Court **GRANTS** the Motion for Final Approval of the Settlement Agreement [Doc. 199].

(4)     The Court **GRANTS** Weichert's Motion for Joinder in Plaintiffs' Motion for Final Approval [Doc. 200].

(5)     The Court **GRANTS** eXp's Motion for Joinder in Plaintiffs' Motion for Final Approval [Doc. 203].

(6)     The Court hereby **DISMISSES** this action **WITH PREJUDICE** against Defendants Higher Tech Realty, LLC, d/b/a Mark Spain Real Estate, eXp World Holdings, Inc., Weichert of North America, Inc., and Atlanta Communities Real Estate Brokerage, LLC.

(7)     The Court **GRANTS** Plaintiffs' Motion for Award of Attorneys' Fees and Expenses [Doc. 188].

(8)     The Court **GRANTS** Plaintiffs' Motion to Preliminarily Approve Plan of Allocation for Settlement [Doc. 232] and **ORDERS** as follows:

- The Plan of Allocation submitted by Plaintiffs is preliminarily approved;

66

- Within ten (10) days of the date of this Order, Plaintiffs shall cause the Plan of Allocation [Doc. 232-1] to be posted to the dedicated settlement website established by the settlement administrator (www.NationwideRealEstateCommissionSettlement.com);

- The settlement administrator will provide notice explaining the Plan of Allocation to all those members of the Settlement Class who have submitted claims. This notice will be delivered to each claimant using the email address provided in the claim submitted. If the claimant did not provide an email address, the notice will be delivered to the claimant via U.S. Mail;

- The notice of the Plan of Allocation will explain that the settlement fund will be allocated on a pro rata basis with each claimant's share based on the amount of buyer's broker's commission the claimant paid as a percentage of the total buyer's brokers' commissions paid by all claimants;

- The notice also will explain that each claimant has sixty (60) days from the date of delivery of the notice to alert the settlement administrator of any objection to the Plan of Allocation;

- Following the expiration of the sixty (60) day notice period, the Court shall hold a hearing to consider any objections to the Plan of Allocation. Any objecting claimant must appear, either in person or through counsel, at that hearing to voice the claimant's objection. Failure of the claimant or his or her counsel to appear will waive the objection. The notice delivered to each claimant will apprise the claimant of this requirement;

67

- If there are no objections, the Court may dispense with the hearing and approve the plan of allocation; and

- Upon final approval of the Plan of Allocation and the resolution of any appeals of the final approval of the settlements, the settlement administrator will disburse the settlement funds to each claimant based on the Plan of Allocation.

The docket reflects that thirteen Defendants remain in this case. Counsel for Plaintiffs has represented that these entities must have been a part of the NAR Settlement or have otherwise reached settlements with the Gibson Plaintiffs. Jan. 7 Knight Decl. ¶ 8. Accordingly, it is further **ORDERED** that Plaintiffs **SHOW CAUSE IN WRITING** within fourteen (14) days of the date of this Order why this case should not be dismissed with prejudice as to the remaining Defendants.

The Court expressly retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlement Agreements and to interpret, implement, administer and enforce the Settlement Agreements (including with respect to the scope of the Settlement Class, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process and the plan of allocation, in accordance with the Settlement Agreements, for the benefit of the Settlement Class. The Court does this for the purpose of satisfying the requirements of

68

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994), concerning the

obligation of a Court entering a settlement agreement to speak clearly when it

wishes to retain jurisdiction.

**IT IS SO ORDERED** this _31ˢᵗ_ day of March, 2026.

MARK H. COHEN
United States District Judge

69